UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY A. CARL,

        Plaintiff,

Case No. 1:11-cv-94

Hon. Robert J. Jonker

v.

COUNTY OF MUSKEGON,
*et al.*,

        Defendants.

                                 /

**REPORT AND RECOMMENDATION**

This matter is now before the court on defendant Katherine A. Jawor, D.O.'s "Motion for summary judgment of Count 5 of plaintiff's complaint (alleged violation of MCL 330.1722)" (docket no. 206) and "Motion for partial summary judgment as to all plaintiff's claims other than Count 5 (which is addressed in a separate motion)" (docket no. 208). These two motions seek summary judgment on Count I (deliberate indifference), Count V (violation of Michigan Mental Health Code, M.C.L. § 330.1722) and Count VI (gross negligence), which constitute all of plaintiff's claims against Dr. Jawor.

        **I.**        **Plaintiff's allegations against Dr. Jawor**

In February 2008, plaintiff was employed as a caregiver for an elderly couple in Muskegon, Michigan. Amend. Compl. at ¶ 21. Plaintiff was arrested on February 23, 2008, after he urinated on the side of the elderly woman's head and then tried to dispense soap on the woman's husband from a liquid soap dispenser. *Id.* at ¶¶ 22, 25. He was charged with two misdemeanors, assault and battery on each client. *Id.* at ¶ 25. Plaintiff was evaluated at the Hackley Hospital

Emergency Room before his admission to the Muskegon County Jail on February 23rd. *Id.* at ¶ 26. The attending physician at the emergency room recommended that plaintiff be returned to the jail and evaluated by Community Mental Health Services (CMH). *Id.* Plaintiff was subsequently released on bond. *Id.* at ¶ 25.

On February 27, 2008, plaintiff was re-arrested on felony charges arising from the incident, i.e., two charges of vulnerable adult abuse, 1st degree, M.C.L. § 750.145(1). *Id.* at ¶ 25. *See* Order for competency evaluation (docket no. 1-9). Upon arriving at the jail, the booking officer wrote in the inmate log that plaintiff "is suffering from severe mental problems. . . ." Amend. Compl. at ¶ 27. Julie McLaughlin, PAC, a physician's assistant with CMH, under the supervision of CMH psychiatrist Zia Khan, M.D., evaluated plaintiff on March 3, 2008, noting that plaintiff: "is not able to join the general population" at the jail and "is floridly psychotic and needs to be treated at a psychiatric facility." *Id.* at ¶ 28. McLaughlin further noted that she did not believe that plaintiff "has any understanding why he is in jail or what his behaviors were;" that plaintiff's present prescription for Seroquel "is not very effective;" and that plaintiff should have a treatment plan which included a transfer to the Kalamazoo Psychiatric Hospital "where he will hopefully undergo treatment for his psychosis and this is encouraging." *Id.*; *See* Physician Progress Note (March 3, 2008) (docket no. 1-3). Steve Weinert, MA, LLP, an emergency mental health services therapist, accompanied McLaughlin on March 3rd, and completed a "Jail Request for CMH Consultation" for plaintiff. Amend. Compl. at ¶ 29; Jail Request for CMH Consultation (March 3, 2008) (docket no. 1-4). Weinert wanted to evaluate plaintiff "for danger to self/others" and to determine a course of treatment. *Id.* Weinert characterized plaintiff as paranoid and "preoccupied with a 'glowing light' in his cell that is tugging at his brain," and concluded that "[i]t is this evaluator's impression that

[plaintiff] requires intensive psychiatric treatment that would most appropriately be delivered through admission to the Center for Forensic Psychiatry [located in Saline, Michigan]." *Id.* Weinert provided a copy of his request for CMH consultation form to the jail. Amend. Comp. at ¶ 30.

Defendant Katherine Jawor, D.O., examined plaintiff on March 5, 2008. *Id.* at ¶ 31. While plaintiff alleged that Dr. Jawor was "a CMH psychiatrist," it is undisputed that she was an independent contractor for CMH. *Id.* at ¶ 31; Dr. Katherine Jawor Aff. at ¶ 1 (docket no. 215-1). Plaintiff's claims against Dr. Jawor arise from this examination. After reviewing the Weinert and McLaughlin's notes from March 3rd and (according to plaintiff) interviewing plaintiff "for a mere four minutes," Dr. Jawor concluded that she would not certify plaintiff for admission to a hospital "because I am seeing nothing to give him a positive cert." Amend. Comp. at ¶ 31; *see* CMH Progress Notes (March 5, 2008) (docket no. 1-5). Because plaintiff's amended complaint incorporates the CMH Progress notes for March 5, 2008, and those notes reflect Dr. Jawor's contested examination of plaintiff, the court will address the notes in detail. Dr. Jawor interviewed plaintiff in the jail from 4:18 p.m. to 4:22 p.m. CMH Progress Notes (March 5, 2008). She record the following:

> **REVIEW OF PROGRESS:** (Target symptoms, functioning level). This is my first contact with Mr. Carl. He was seen by Community Mental Health personnel Jule Mclaughlin, Steve Weinert from Emergency Services, on 3/4108. He was floridly psychotic at t time, reporting that he was hearing voices, stating that he felt the light was sucking his brain and his soul out. He was exhibiting psychomotor agitation. He acknowledges sleep disturbances, intermittent suicidal ideations when deputies were rude to him, and my intent was to go in and assess if there was a need for a positive physician cert. I brought my nursing personnel with me, Connie Reahm. Patient was seen in the exam room at the jail with the door open. Several guards were outside and overhead [sic] the conversation, as well as my nurse Connie Reahm. The patient is reporting he felt he was in jail to get his license. [sic] He acknowledged he had been on medications Lexapro and Seroquel in the past for depression. He acknowledged to me he has a history of alcohol dependency. He

3

> states the last time he drank was February 8th, and acknowledged he is past any sort of alcohol withdrawal phenomenon.
>
> He is reporting to me he is not really depressed. He denies suicidal or homicidal ideation, auditory hallucinations or paranoid delusions. I did ask him if he felt like his brain was being sucked out by the light and he denied this. When I asked him why there is such a significant change from the interview with the staff yesterday and today, he states that he was just messing with them. He inquired what the dosage was of the Seroquel and I did tell him the Seroquel is 300 in the morning and 600 at night. He was agreeable to doing that. I asked him to sign a consent for the Seroquel, which he had flatly refused to do yesterday, and he cooperatively signed the consent. I asked him if he had any further questions and he stated no. I am uncertain why there is such a significant change from the paranoid delusional state that he presented yesterday and today.
>
> **MENTAL STATUS:** Mr. Car1 was dressed in blue hospital garb. He was not shackled. He sat next to the door, maintained good eye contact with me. He was pleasant and cooperative. Speech was non-pressured. Thought processes were relevant. Thought content, he is denying suicidal or homicidal ideation, delusions, auditory hallucinations, visual hallucinations or paranoid delusions. Cognitive function appears to be intact today. He is able to tell me his history with medications, as well as a past history of alcohol dependency. He did not exhibit any psychomotor agitation. He reports he is eating, does not necessary [sic] like the food.

*Id.* Dr. Jawor also noted that plaintiff denied side effects from medication. *Id.*

The doctor diagnosed plaintiff with: Mood Disorder NOS (296.90); Paranoid Schizophrenia (295.30); and AlcoholDependence (303.90), in early remission. *Id.* The doctor assigned plaintiff a Global Assessment of Functioning (GAF) score of 45-50. *See Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR)*, (4th ed., text rev., 2000).[1] This GAF score

---

[1] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning" on a hypothetical continuum of mental health-illness. American Psychiatric Assoc., *DSM-IV-TR*, pp. 32, 34. The GAF score is taken from the GAF scale, which rates individuals' "psychological, social, and occupational functioning," and "may be particularly useful in tracking the clinical progress of individuals in global terms." *Id*. at 32. The GAF scale ranges from 100 to 1. *Id.* at 34. At the high end of the scale, a person with a GAF score of 100 to 91 has "no symptoms." *Id.* At the low end of the GAF scale, a person with a GAF score of 10 to 1 indicates "[p]ersistent danger of hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death." *Id.*

lies within the 41 to 50 range, which indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at p. 34. The doctor's "treatment plan" had two components. First, "[t]he patient is agreeable to taking his medications, Seroquel 300 mg AM and 600 HS." CMH Progress Notes (March 5, 2008). Second, [a]t the present time I am giving him a negative cert because I am seeing nothing to give him a positive cert." *Id.*

In Count I, plaintiff alleged that Dr. Jawor was deliberately indifferent to his "obvious and serious medical needs and this constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth and Fourteenth Amendments." Amend. Compl. at ¶ 59. In Count V, plaintiff alleged that he "had a right under Michigan's Mental Health Code to be free from abuse or neglect" under M.C.L. § 330.1722. *Id.* at ¶ 115. With respect to Dr. Jawor, plaintiff alleged that ". . . Dr. Jawor . . . subjected Mr. Carl to neglect in numerous ways, including (a) not following through on the CMH treatment plan dated March 3, 2008 signed by Jule McLaughlin, PAC and Dr. Khan recommending that Mr. Carl be transferred to the Kalamazoo Psychiatric Hospital to undergo treatment; (b) not following through on the recommendation dated March 3, 2008 signed by Steve Weinert, MA, LLP that Mr. Carl receive intensive psychiatric treatment; (c) Dr. Jawor concluding after a four-minute evaluation on March 5, 2008 that Mr. Carl could not be certified for admission to a hospital at that time despite contrary findings and recommendations of Dr. Khan, Ms. McLaughlin, and Steve Weinert two days prior . . ." *Id.* at ¶ 116. In Count VI, plaintiff alleged that Dr. Jawor was grossly negligent in the treatment of, and failure to provide treatment to, plaintiff. *Id.* at ¶ 118. Specifically, plaintiff alleged that Dr. Jawor owed a duty of care to plaintiff but her

conduct " was so reckless as to demonstrate a substantial lack of concern for whether harm resulted to Mr. Carl, and in fact Mr. Carl did suffer harm as a result of defendant['s] gross negligence." *Id.* Plaintiff seeks damages and statutory attorney's fees.

## II. Review of claims

### A. Summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving

party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.     Deliberate indifference claim

#### 1.     Legal standard

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983. Here, Dr. Jawor seeks summary judgment on the ground that she is not a "state actor" for purposes of plaintiff's § 1983 claim.

Whether the district court has subject matter jurisdiction is typically determined under Fed. R. Civ. P. 12(b)(1). *Little Traverse Bay Bands of Odawa Indians v. Great Spring Waters of America, Inc.*, 203 F.Supp.2d 853, 855 (W.D. Mich. 2002). In resolving such a motion, the district court must assume that plaintiff's allegations are true and must construe the allegations in a light most favorable to him. *Id.* "Relief is appropriate only if, after such construction, it is apparent to the district court that there is an absence of subject matter jurisdiction." *Id.* Because

7

defendant Jawor has moved for summary judgment, the court will apply that standard to determine whether she is "state actor" for purposes of § 1983.

The relevant standard for determining whether a doctor treating a prisoner acted under color of state law for purposes of a § 1983 claim focuses on "the relationship among the State, the physician and the prisoner." *Scott v. Ambani*, 577 F.3d 642, 649 (6th Cir. 2009), quoting *West v. Atkins*, 487 U.S. 42, 55-56 (1988).

> There are three tests employed by the courts to determine whether the challenged conduct is fairly attributable to the state: (1) the public function test, (2) the state compulsion test and (3) the symbiotic relationship or nexus test. The public function test requires that the private entity exercise powers which are traditionally exclusively reserved to the state. The state compulsion test requires that a state exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state. Finally, under the symbiotic relationship test, the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself.

*Collyer v. Darling*, 98 F.3d 211, 232 (6th Cir. 1996) (internal citations and quotation marks omitted). Thus, "[i]n determining whether a doctor acted under color of state law, the primary factor is 'the physician's function within the state system, not the precise terms of his employment.'" *Scott*, 577 F.3d at 649, quoting *West*, 487 U.S. at 56. In cases involving the medical treatment of someone held in state custody, the court looks at whether the medical treater was "clothed with the authority of state law" while treating the patient. *Id.*

**2.      Discussion**

**a.      CMH's agreements with the Muskegon County Sheriff and Dr. Jawor**

In 2008, CMH had an "informal agreement" to provide services to the Muskegon County Jail. Pamela Beane Dep. at p. 22 (docket no. 232-1).[2] As part of this informal agreement, CMH provided eight hours of weekly "emergency services," an "on-call emergency service" for weekends and after hours, and a "jail diversion service." *Id.* The existence of this informal agreement indicates that there was some type of contractual relationship between the Muskegon County Jail and CMH (an agency of the Muskegon County government) under which CMH provided services at the jail.[3] For her part, Dr. Jawor had a separate agreement with CMH, identified as a "Services contract between Community Mental Health Services of Muskegon County and Katherine Jawor, D.O.," effective June 1, 2007 through September 30, 2008 (Jawor Contract) (docket no. 209-4). Dr. Jawor's services contract identifies her as an independent contractor of CMH:

> The relationship of the Provider to the Payor is that of an independent contractor. This contract will not be construed to establish any principal/agent relationship between the parties hereto.

---

[2] In his appendix, plaintiff cites to Ms. Beane's deposition as Exhibit 20. *See* Appendix at p. 71, n. 18 (docket no. 228). While the deposition is correctly identified in the hard copies submitted to chambers, the court notes that her deposition appears on the docket sheet as the second "Exhibit 19." *See* Exhibit 19 (docket nos. 231-5 and 232-1).

[3] Plaintiff has presented a copy of an "Operating agreement between Community Mental Health Services of Muskegon County and the Muskegon County Sheriff's Department" (CMH Operating Agreement) dated May 10, 2011 (docket no. 247-4). In this agreement, CMH is identified as an agency of Muskegon County Government, established under the Michigan Mental Health Code of 1974, as amended, M.C.L. § 330.1001 *et seq.*, "to ensure that adequate and appropriate mental health care is provided to the residents of Muskegon County, including the inmates of the jail." CMH Operating Agreement (Preamble). However, this operating agreement was not in effect when plaintiff was housed at the jail in 2008. While Ms. Beane stated that the "informal agreement" from 2008 was "the same agreement" as the written (2011) agreement, she gave no further examples of similar terms within the two agreements. Pamela Beane Dep. at p. 22.

Jawor Contract (¶ E.1.).[4]

### b. Dr. Jawor's jail visit on March 5, 2008

Dr. Jawor testified that the purpose of her meeting with plaintiff on March 5, 2008 was to "evaluate the need for hospitalization." Dr. Katherine Jawor Dep. at p. 76 (docket no. 209-5). Dr. Jawor testified that the CMH supervisor asked her to perform this evaluation. *Id.* Dr. Jawor repeatedly testified that she was focused on whether plaintiff would meet the standard for involuntary certification to be committed to the hospital (involuntary commitment). *Id.* at pp. 90-91, 111. *See id.* at p. 104 ("my role was to see this individual and see if he needed involuntary hospitalization"); p. 112 ("[m]y role was to assess if he needed to be involuntarily hospitalized").[5] Dr. Jawor testified that plaintiff was the only person she evaluated at the jail in 2008. *Id.* at p. 99. Although the progress notes reflect otherwise, Dr. Jawor testified that the March 5, 2008 evaluation took 40 to 42 minutes. *Id.* at p. 106. Finally, Dr. Jawor stated in her affidavit that "[n]obody has ever asked me to do anything for Mr. Carl beyond evaluating him on March 5, 2008 to determine whether he was certifiable for involuntary hospitalization." Dr. Katherine Jawor Aff. at ¶ 7 (docket no. 215-1).

Plaintiff contends that Dr. Jawor's role was not limited to certifying plaintiff for involuntary commitment. In this regard, plaintiff points out: that Dr. Jawor checked plaintiff's

---

[4] The court notes that defendant Dr. Jawor has only provided three pages of her 22 page service contract. *See* Jawor Contract (docket no. 209-4).

[5] Neither party details the procedure for involuntary certification to be committed to a hospital. Defendant Dr. Jawor identifies the applicable statute as M.C.L. § 330.1401(1)(a), which states that, as used in this chapter ["Civil admission and discharge procedures: Mental illness"] a "person requiring treatment" is defined as "[a]n individual who has mental illness, and who as a result of that mental illness can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself, herself, or another individual, and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation."

medication; that the doctor used a progress note rather than "a standard involuntary commitment form;"[6] that the doctor was identified as the prescriber; that she used a service billing code of 90862 which plaintiff states is the code for "medication review" and "Pharmacological management;" that Mr. Weinert's request was not limited to an evaluation for involuntary commitment; and Mr. Weinert's interrogatories did not mention limiting the scope of Dr. Jawor's referral to an evaluation for certification for involuntary commitment. *See* Plaintiff's Appendix at ¶ 46 (docket no. 228).

### c. The public function test

Plaintiff relies on the public function test, contending that Dr. Jawor was a state actor under the public function analysis. Plaintiff's Response at pp. 10-11 (docket no. 227).[7] *See, Scott v. Ambani, supra,* at 649. "The public function test requires that the private entity exercise powers which are traditionally exclusively reserved to the state, such as holding elections, or eminent domain. *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992) (internal citations omitted). In this regard, the Sixth Circuit observed that "providing mental health services has not been a power which has traditionally been exclusively reserved to the state." *Id.*

Dr. Jawor contends that her role was limited to performing an evaluation to determine whether to certify plaintiff for involuntary commitment. Plaintiff argues that Dr. Jawor had a more expansive role, and was responsible for treating him. The extent of Dr. Jawor's involvement is significant in determining whether she was a state actor for purposes of plaintiff's § 1983 claim. Contrary to plaintiff's contention, there is insufficient evidence for a jury to reasonably find that Dr.

---

[6] Plaintiff does not identify the "involuntary commitment form" which he claims should have been used or the relevant statute.

[7] Because plaintiff does not claim that Dr. Jawor is a state actor under the state compulsion test or the symbiotic relationship test, it is unnecessary for the court to evaluate her status under those tests.

Jawor had been engaged in any role other than to evaluate plaintiff to determine whether he should be certified for an involuntary commitment. *See Copeland*, 57 F.3d at 478-79. It is undisputed that the doctor examined plaintiff only one time. The progress notes end with a statement that plaintiff was agreeable to taking his medication and that the doctor was giving him a "negative cert." Dr. Jawor testified that she performed a one-time evaluation of plaintiff at the request of her supervisor. As part of her evaluation, Dr. Jawor determined that plaintiff could remain in the jail with his existing medication and that it was unnecessary to certify him for involuntary commitment. There is no reference to follow-up appointments with plaintiff to suggest that Dr. Jawor was engaged in providing on-going treatment to plaintiff. Indeed, it was psychiatrist Dr. Desai and psychologist Mr. Weinert who followed up with plaintiff two days later on March 7, 2008. *See* Jail Request for CMH Consultation (docket no. 219-2). In summary, there is no genuine issue of material fact that Dr. Jawor's involvement with plaintiff was limited to an evaluation of his condition on March 5, 2008, to determine whether he should be subject to involuntary commitment.

Since Dr. Jawor's role was limited to certifying plaintiff for involuntary commitment, the court must determine whether that role is a public function. Here the court is guided by the Sixth Circuit's opinion in *Ellison v. Garbarino*, 48 F.3d 192 (1995), where the Sixth Circuit specifically addressed whether involuntary commitment by a private physician implicated state action for purposes of the public function test. After reviewing decisions from other circuits which determined that involuntary commitment was not state action, the Sixth Circuit noted that such a determination is state specific. *Ellison*, 48 F. 3d 195-96. Thus, under the public function test, it is the plaintiff's burden to present an analysis of the state's history of involuntary commitment to show that involuntary private commitment is a public function, i.e., "one traditionally the exclusive

12

prerogative of the state." *Id.* If the plaintiff fails to make this showing, then the public function test is inapplicable. *Id.*

Plaintiff has not demonstrated (nor even attempted to demonstrate) that involuntary commitment is public function in Michigan, thus rendering the "public function test" is inapplicable to Dr. Jawor. *See Ellison*, 48 F. 3d at 196 ("Plaintiff, however, neglected to offer any analysis concerning the history of involuntary commitment in Tennessee. Considering that plaintiff bears the burden on this issue, this failure alone renders this test [i.e. the public function test] inapplicable."). Accordingly, Dr. Jawor's motion for summary judgment with respect to plaintiff's claim in Count I (deliberate indifference) should be granted.

### III.     State law claims

Plaintiff's remaining counts against Dr. Jawor involve state law claims. Count V alleges a violation of Michigan Mental Health Code, M.C.L. § 330.1722, while Count VI alleged gross negligence. Section 1367 of Title 28 of the United States Code provides that "the district court shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form a part of the same case or controversy." 28 U.S.C. § 1367(a). Here, the court exercised its supplemental jurisdiction over plaintiff's state law claims, presumably because those claims were intimately related to the alleged § 1983 violation. The dismissal of plaintiff's federal claim against defendants, however, requires the court to re-examine the issue of supplemental jurisdiction for state law claims against this defendant. Section 1367(c)(3) provides that a district court may decline to exercise supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction." Thus, once a court has dismissed a plaintiff's federal claim, the court must determine whether to exercise, or not

to exercise, its supplemental jurisdiction under § 1367. *See Campanella v. Commerce Exchange Bank*, 137 F.3d 885, 892-893 (6th Cir. 1998). As a general rule "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254-1255 (6th Cir. 1996). Here, the Court has rejected plaintiff's federal claims against Dr. Jawor. There is no reason to retain supplemental jurisdiction over plaintiff's state law claims which are unique to this defendant, and they should be dismissed.

### IV. Recommendation

For the reasons set forth above, I respectfully recommend that defendant Dr. Jawor's "motion for summary judgment as to all plaintiff's claims other than Count 5" (docket no. 208) be **GRANTED** as to Count I (deliberate indifference).

With the dismissal of Count I, and plaintiff's only federal claim against Dr. Jawor, the court is left with Counts V and VI, plaintiff's supplemental state law claims against Dr. Jawor for violation of the Michigan Mental Health Code and gross negligence. I further recommend that Dr. Jawor's "motion for summary judgment as to all plaintiff's claims other than Count 5" (docket no. 208) be **DENIED** as to Count VI, that defendant's "motion for summary judgment of Count 5 of plaintiff's complaint" (docket no. 206) be **DENIED**, and that plaintiff's Counts V and VI be **DISMISSED** for lack of supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3).

I further recommend that Dr. Jawor be **DISMISSED** from this action.

Dated: August 30, 2012                   /s/ Hugh W. Brenneman, Jr.
                                                     HUGH W. BRENNEMAN, JR.
                                                     United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).