UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY A. CARL,

    Plaintiff,

v.

COUNTY OF MUSKEGON,
*et al.*,

    Defendants.
_____/

Case No. 1:11-cv-94

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

This matter is now before the court on motions for summary judgment[1] filed by the following defendants: Corrections Officer (CO) R. Topp (docket no. 168); CO S. Smith (docket no. 171); CO J. Cerka (docket no. 174); CO Darryl Hairston (docket no. 177); and Sgt. Todd Gilchrist (docket no. 190). With respect to defendant Gilchrist's motion, the court will address only Counts III (excessive force) and VII (intentional infliction of emotional distress).[2] These motions for summary judgment relate to events which occurred on March 6, 2008.

    **I.**    **Plaintiff's allegations relevant to Counts III and VII**

In February 2008, plaintiff was employed as a caregiver for an elderly couple in Muskegon, Michigan. Amend. Compl. at ¶ 21. Plaintiff was arrested on February 23, 2008, after

---

[1] Some of the motions are incorrectly designated as motions for "summary disposition."

[2] The motions for summary judgment filed by defendants Topp, Smith, Cerka and Hairston address Counts III and VII only, while defendant Gilchrist's motion addresses Counts I, II, III, IV, VI and VII. This report will not address Gilchrist's motion seeking summary judgment as to Counts I, II, IV or VI. Nor will the report address Count VII to the extent this count involves claims of intentional infliction of emotional distress arising from acts occurring on dates other than March 6, 2008.

he urinated on the side of the elderly woman's head and then tried to dispense soap on the woman's husband from a liquid soap dispenser. *Id.* at ¶¶ 22, 25. He was charged with two misdemeanors, assault and battery on each client. *Id.* at ¶ 25. Plaintiff was evaluated at the Hackley Hospital Emergency Room before his admission to the Muskegon County Jail on February 23rd. *Id.* at ¶ 26. The attending physician at the emergency room recommended that plaintiff be returned to the jail and evaluated by Community Mental Health Services (CMH). *Id.* Plaintiff was subsequently released on bond. *Id.* at ¶ 25.

On February 27, 2008, plaintiff was re-arrested on felony charges arising from the incident, i.e., two charges of vulnerable adult abuse, 1st degree, M.C.L. § 750.145(1). *Id.* at ¶ 25. *See* Order for competency evaluation (docket no. 1-9). Upon arriving at the jail, the booking officer wrote in the inmate log that plaintiff "is suffering from severe mental problems. . . ." Amend. Compl. at ¶ 27. Julie McLaughlin, PAC, a physician's assistant with CMH, under the supervision of CMH psychiatrist Zia Khan, M.D., evaluated plaintiff on March 3, 2008, noting that plaintiff: "is not able to join the general population" at the jail and "is floridly psychotic and needs to be treated at a psychiatric facility." *Id.* at ¶ 28. McLaughlin further noted that she did not believe that plaintiff "has any understanding why he is in jail or what his behaviors were;" that plaintiff's present prescription for Seroquel "is not very effective;" and that plaintiff should have a treatment plan which included a transfer to the Kalamazoo Psychiatric Hospital "where he will hopefully undergo treatment for his psychosis and this is encouraging." *Id.*; *See* Physician Progress Note (March 3, 2008) (docket no. 1-3). Steve Weinert, MA, LLP, an emergency mental health services therapist, accompanied McLaughlin on March 3rd, and completed a "Jail Request for CMH Consultation" for plaintiff. Amend. Compl. at ¶ 29; Jail Request for CMH Consultation (March 3, 2008) (docket no.

1-4). Weinert wanted to evaluate plaintiff "for danger to self/others" and to determine a course of treatment. *Id.* Weinert characterized plaintiff as paranoid and "preoccupied with a 'glowing light' in his cell that is tugging at his brain," and concluded that "[i]t is this evaluator's impression that [plaintiff] requires intensive psychiatric treatment that would most appropriately be delivered through admission to the Center for Forensic Psychiatry [located in Saline, Michigan]." *Id.* Weinert provided a copy of his request for CMH consultation form to the jail. Amend. Comp. at ¶ 30.

Katherine Jawor, D.O., a psychiatrist utilized by CMH, examined plaintiff on March 5, 2008. *Id.* at ¶ 31. After reviewing the Weinert and McLaughlin's notes from March 3rd and interviewing plaintiff, Dr. Jawor concluded that she would not certify plaintiff for admission to a hospital "because I am seeing nothing to give him a positive cert." *Id.*; *see* CMH Progress Notes (March 5, 2008) (docket no. 1-5). Dr. Jawor noted plaintiff was agreeable to taking his medications at that time. *Id.*

The allegations at issue involve Count III (excessive force) and Count VII (intentional infliction of emotional distress) which arose the next day. Early in the morning on March 6, 2008, CO Hairston was distributing bags containing breakfast to the jail inmates and pretrial detainees. Amend. Comp. at ¶¶ 75-76. The breakfast bags were on a cart that Hairston pushed through the hallway. *Id.* at ¶ 77. Hairston would unlock and open the cell doors and "toss" in the bag. *Id.* When Hairston reached plaintiff's cell, plaintiff was "confused as to why he was there and why he was not receiving medical help or treatment" and walked up to the door. *Id.* at ¶ 78. When Hairston opened the cell door, plaintiff "while keeping his feet and entire torso inside the cell . . . stuck his head out the open doorway and shouted down the hallway for anyone who would listen, 'Let me out of here.'" *Id.* at ¶ 80. Without speaking to plaintiff, Hairston "put his

hand on [plaintiff's] forehead and shove [plaintiff's] forehead back into the cell," tossed in the breakfast bag and continued his deliveries. *Id.* at ¶¶ 81-86. Plaintiff ate his breakfast. *Id.* at ¶ 87.

Approximately one hour later, CO Hairston returned plaintiff's cell with Sgt. Gilchrist, CO Cerka, CO Topp and CO Smith. *Id.* at ¶ 88. Sgt. Gilchrist was in charge of the detachment, which carried a "black restraint chair." *Id.* at ¶¶ 89-90. Without speaking, Hairston grabbed plaintiff, while Cerka, Topp and Smith stood beside plaintiff, with "each officer grabbing hold of one of [plaintiff's] legs. *Id.* at ¶ 91. Sgt. Gilchrist put on a rubber glove. *Id.* at ¶ 92. Plaintiff was scared and began to cry. *Id.* at ¶ 93. Sgt. Gilchrist went behind plaintiff and grabbed his testicles and "snapped them" like a rubber band, causing plaintiff "to cough in intense pain." *Id.* at ¶¶ 94-95.

While plaintiff was "coughing in pain" and being held by the other officers, Hairston "tackled [plaintiff] on the concrete bench" and used his knee to drive plaintiff's head into the concrete bench. *Id.* at ¶¶ 96-97. Plaintiff did not resist but curled up into the fetal position, cried and told defendants "You're hurting me." *Id.* at ¶¶ 98-99. Hairston told plaintiff to "relax" and "stop resisting" as he drove plaintiff's head into the concrete bench, breaking plaintiff's glasses. *Id.* at ¶ 100. Defendants placed plaintiff into the restraint chair, strapping his arms, legs and chest so that he could not move. *Id.* at ¶ 101. Defendants left plaintiff in the restraint chair, where he continued to cry. *Id.* at ¶ 102. Approximately one hour later, "other guards at the jail" removed plaintiff from the restraint chair. *Id.* at ¶ 103.

Plaintiff alleged that defendants treated him like an animal or a piece of garbage in violation of his Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment. *Id.* at ¶ 105. Plaintiff further alleged: that the force applied to plaintiff was not applied

4

in a good-faith effort to maintain or restore discipline, but was applied maliciously and sadistically to cause harm and punish plaintiff for his bizarre behavior (caused by mental illness); that the force applied to plaintiff's testicles was shocking to the conscience of mankind, being unnecessary, unprovoked and serving no legitimate purpose; and that defendants' acts of grabbing and snapping plaintiff's testicles and kneeling on his head violated plaintiff's constitutional right to be free from the use of excessive force. *Id.* at ¶¶ 104-107. Plaintiff seeks damages and statutory attorney's fees.

## II. Legal standard

### A. Summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support

> plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B. Plaintiff's excessive force claim

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). At the time of the alleged use of excessive force, it is undisputed that plaintiff was a pretrial detainee in the Muskegon County Jail. "It is clear . . . that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Id.* at 395 n. 10. *See Bell v. Wolfish*, 441 U.S. 520, 537 n. 16 (1979) ("Due

6

process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment."). In this regard, "[t]he substantive due process rights of the Fourteenth Amendment protect citizens from the arbitrary exercise of governmental power." *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001). The Sixth Circuit has yet to develop a definitive test for resolving the legal analysis applicable to excessive force claims against pretrial detainees. *See Griffin v. Hardrick*, 604 F.3d 949, 953 (6th Cir. 2010) ("[t]he law is unsettled as to whether the analysis for a Fourteenth Amendment excessive-force claim and an Eighth Amendment excessive-force claim is the same"); *Leary v. Livingston County*, 528 F.3d 438, 443 (6th Cir.2008) ("there is room for debate over whether the Due Process Clause grants pretrial detainees more protections than the Eighth Amendment does"). In the absence of definitive instructions from the Sixth Circuit on this issue, the court will review plaintiff's excessive force claim under the standards for both the Eighth and Fourteenth Amendments.

Assuming that the court applied an Eighth Amendment analysis to plaintiff's claim, the Supreme Court has held that "the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)); *see also Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir. 1993). In analyzing such claims, the court must examine whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Hudson*, 503 U.S. at 6. Courts evaluate the injury suffered, "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful

7

response.'" *Id*. at 7, quoting *Whitley*, 475 U.S. at 321. As the Sixth Circuit summarized in *Moore*, 2 F.3d at 700, "To determine whether a claim of assault rises to a level of constitutional magnitude, a court must consider the reasons or motivation for the conduct, the type of force used, and the extent of the inflicted injury."

Courts must give deference to actions prison guards take to maintain prison discipline, as long as those actions are taken pursuant to a considered choice and not in bad faith or for no legitimate purpose. *Whitley*, 475 U.S. at 321-22. "[Not every] malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson*, 503 U.S. at 9. Consequently, where the use of some force is required to restore order, it does not violate the Eighth Amendment unless the force used is "repugnant to the conscience of mankind" or the force is used "maliciously and sadistically for the very purpose of causing harm." *Id.* at 9,10 (citations omitted). A *de minimis* use of force will not support an Eighth Amendment claim. *See id.* at 9-10; *Moore*, 2 F.3d at 700-01.

Finally, the test applied by the Supreme Court to determine when governmental conduct reaches the threshold of violating substantive due process rights under the Fourteenth Amendment is to ask whether the alleged conduct "shocks the conscience." *Darrah*, 255 F.3d at 306, citing *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998). *See, e.g., Reynolds v. Guerra*, 670 F.Supp.2d 633, 640 (N.D. Ohio 2009) ("[t]he Due Process Clause of the Fourteenth Amendment protects pretrial detainees from conduct that shocks the conscience and excessive force that amounts to punishment").

### III. Discussion

### A. Plaintiff's testimony and other evidence related to the March 6, 2008 assault

At his deposition, plaintiff could not identify the date or time of the alleged assault, other than "it was during a.m. hours, during the morning hours." Timothy Carl Dep. at p. 58 (docket no. 228-1). When the officer passing out breakfast bags [Hairston] came to the cell, plaintiff stuck his head out of the door. *Id.* at p. 59. Plaintiff was very scared and yelled "let me outta here." *Id.* at p. 60. The officer placed his hand on plaintiff's forehead, shoved it back into the cell and shut the cell door. *Id.* Plaintiff admitted that he suffered no injuries from Hairston's action. *Id.*

Sometime later (plaintiff could not give a specific time line), the officer returned with four other guards. *Id.* at pp. 60-61. Without warning or notifying plaintiff of what he "did wrong to deserve this treatment," the officers came into the cell. *Id.* at p. 61. Two of the officers grabbed his leg, while Sgt. Gilchrist "put on a rubber glove, and proceeded to pull down my pants and assault my testicles." *Id.* Plaintiff choked up and began to scream and cry. *Id.* at pp. 61-62. Plaintiff described the balance of the assault as follows:

> The other guard immediately took me down to the cement bench, put his knee on top of, between my head and my neck, pretty much weighting himself down on my neck, and this is when I believe my glasses were broke, to the best of my memory.
>
> And as he put his knee on my neck, I was immediately feeling shortness of breath. Right away I said, sir -- I didn't say sir, but I said, I said, you're hurting me, and he said stop resisting. And as you can imagine being in that type of a position, you're so scared that your body reacts on impulse.
>
> So as I said, you're hurting me, he struck his knee further in my neck so I could not move, and that's when they proceeded to put me in this black restraint chair. They strapped me down, restrained me from the legs up to the chest, and left the cell.

*Id.* at p. 62. Plaintiff had no idea how long he was in the chair, but it was at least an hour. *Id.*

9

When asked about his injuries, plaintiff stated that he suffered from red marks all over his body from the restraining chair straps touching his skin and that he feared for his life throughout the whole altercation. *Id.* at pp. 62-63. Plaintiff provided a more expansive explanation in his response to an interrogatory:

> Regarding the assault, I experienced extreme pain and extreme fear. The officer's knee was on my head/neck which was on concrete, and this led to shortness of breath and fear of not being able to breath[e]. I also feared my glasses would poke into my eyes. I was afraid that I would be killed. I was afraid because I did not know what I did to deserve this, and I was afraid it might happen again. I felt extreme pain: pain from having my head ground into the concrete and from having my testicles grabbed and snapped. I also felt extremely humiliated and degraded and defenseless. I experienced soreness after the incident all over my body. I had red marks where I was re[s]trained, but I don't know how long the marks lasted.

Plaintiff's Appx. at ¶ 65 (docket no. 228), quoting Plaintiff's Response to Steve Weinert's and CMH's Interrogatory No. 14 (Plaintiff's Exh. 73).

Defendants provided a far different account of the events which occurred on the morning of March 6th. Defendant Hairston testified that when he opened the cell door, plaintiff came toward him and tried to push him out of the way, causing Hairston to become off balance. Darryl Hairston Dep. at pp. 45-46, 52 (docket no. 178-4). Hairston regained his stance and took plaintiff down to the concrete bench, injuring his shoulder and leg while doing so. *Id.* at pp. 52-54. Although defendant Topp testified that he heard Hairston order plaintiff back into the cell, Hairston does not recall having time to say anything to plaintiff. Richard Topp. Dep. at pp 59-60 (docket no. 178-5); Hairston Dep. at p. 54. Hairston controlled Carl's torso while the other deputies gained control of his legs, which Hairston could feel kicking under him. Hairston Dep. at pp. 54-55. Hairston testified that Sgt. Gilchrist was off to the side, making sure that the deputies involved in the incident were proceeding correctly. *Id.* at p. 56. Once Carl was under control (i.e., handcuffed),

10

Hairston returned to passing out breakfast, and did not participate in placing him in the restraint chair. *Id.* at p. 58.

Defendant Cerka submitted only three pages of deposition testimony in support of his motion for summary judgment. Jason Cerka Dep. at pp 80-81 and 83 (docket no. 175-4). Cerka testified that it was a probably "a matter of minutes" between the time he saw Hairston open plaintiff's cell door to deliver a breakfast bag and plaintiff being placed in the restraining chair. *Id.* at p. 80. According to Cerka, Sgt. Gilchrist authorized the use of the restraint chair because plaintiff was coming out of his cell and was resisting Hairston after being "taken to the ground." *Id.* at p. 82.

Defendant Topp testified as follows. That morning, Topp was in the office when he saw Hairston open the door to plaintiff's cell to deliver the breakfast bag. Richard Topp Dep. at pp. 59, 65-66 (docket no. 169-4). While the door was open, plaintiff walked toward it and partially exited the cell ("he [plaintiff] had broken the threshold of the cell"). *Id.* at pp. 59-60. Hairston ordered him to step back, but plaintiff attempted to exit the cell. *Id.* Hairston placed his hands on plaintiff and pushed plaintiff back into the cell. *Id.* At this point, Topp ran to assist Hairston in taking plaintiff to the ground and delivered a knee strike to plaintiff's thigh to try to get him (plaintiff) to come down. *Id.* at pp. 66-67.

Defendant Scott Smith submitted only two pages of deposition testimony in support of his motion. Scott Smith Dep. at pp. 32 and 35 (docket no. 172-4). Smith responded to plaintiff's cell when he heard a radio call for assistance. *Id.* at p. 32. When he arrived, Smith found deputies attempting to place handcuffs on plaintiff and "wrestling with him on the floor." *Id.* Smith did not recall placing a hand on plaintiff. *Id.* at p. 35. Rather, Smith recalled that he was probably standing by the cell door, i.e., guarding entry and exit to the cell. *Id.* However, Smith did complete a use

of force form after the incident, which indicated that he used "leg restraints/chair" and "pressure points" on the subject. Muskegon County Sheriff Use of Force Form (docket no. 172-5).

Sgt. Gilchrist testified as follows. That morning, Gilchrist was at his desk when he heard the sound of the cell door slamming open. Todd Gilchrist Dep. at pp. 86-87 (docket no. 192-3). He looked at the monitor and saw an open door to plaintiff's cell, but did not see either Hairston or plaintiff on the monitor. *Id.* at pp. 87-88. He responded to the cell within thirty to sixty seconds. *Id.* at p. 89. Upon arrival he found Hairston and other staff attempting to handcuff and control plaintiff on the ground of the cell. *Id.* at pp. 89-90. Plaintiff was resisting their attempts. *Id.* at p. 90. Gilchrist did not remember the exact words being exchanged at that time, but recalled the gist of the conversation being for plaintiff "to cooperate and place his hands behind his back or stop resisting, something along that nature." *Id.* at p. 91. After plaintiff was secured and handcuffed, Gilchrist and the others "took a second" to regroup outside of the cell prior to placing plaintiff in the restraint chair. *Id.* at p. 91. Within no more than two minutes, defendants formulated a plan to place plaintiff in the restraint chair for his safety and the safety of any other staff that might have to deal with him. *Id.* at p. 93. Gilchrist felt that the restraint chair was necessary in light of Hairston's report that plaintiff "attempted to push his way out of the cell." *Id.*

Defendants also contend that one detail as alleged by plaintiff would have been impossible. As discussed, plaintiff testified that Gilchrist pulled his pants down and assaulted his testicles. Tim Carl Dep. at pp. 60-61. Defendants contend that it would have been physically impossible for Sgt. Gilchrist to pull down plaintiff's pants because plaintiff was wearing a one-piece jumpsuit. In this regard, Sgt. Gilchrist gave the following testimony with respect to plaintiff's jail uniform at the time of the March 6 incident:

12

>Q    Do you recall if at that time [March 6, 2008] Mr. Carl was in a jumpsuit?
>
>A    He was in a jumpsuit at that point -- he was in general population; he was not in street clothes so he would have been in a jumpsuit.
>
>Q    And that's a one-piece uniform?
>
>A    Correct.
>
>Q    Orange?
>
>A    If he was down out of security -- it would have been orange, but if he was not in a security cell, it would have been dark blue, but I don't remember what cell he was in prior to that date.
>
>Q    So if Mr. Carl testified that you pulled his pants down on that incident, that wouldn't be an accurate statement because he wasn't wearing pants?
>
>A    Correct.
>
>    MR. SPRINGER: Object to form and foundation.
>
>    BY MR. BREGE:
>
>Q    Was Mr. Carl wearing pants that day?
>
>A    Not to the best of my knowledge.  He would have been in a jumpsuit.

Gilchrist Dep at p. 153 (docket no. 179-1).

While defendants point to the fact that plaintiff was (or "would have been") wearing a jumpsuit (which "would have been" either orange or dark blue), they do not explain the nature of the jumpsuit or whether it would be possible to pull down or somehow open up the jump suit to access plaintiff's testicles.  While plaintiff's testimony refers to his "pants" and does not provide an explanation of how Sgt. Gilchrist reached his testicles through a jumpsuit, defendants have failed to set forth sufficient evidence to demonstrate that it was "physically impossible" for Sgt. Gilchrist to grab plaintiff's testicles on that date.

Defendants also point out that plaintiff did not remember "significant events" on the day prior to the alleged assault or after the alleged assault. For example, plaintiff could not remember being examined by Dr. Jawor on the day before the incident (March 5, 2008) or by Dr. Desai on the day after the incident (March 7, 2008). Timothy Carl Dep. at pp. 86-87. Defendants' arguments regarding plaintiff's memory of events raises an issue of credibility for the jury. This court does not make credibility determinations in deciding a motion for summary judgment. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Defendants also point out that it is routine for all officers to wear gloves when in contact with inmates and that it is likely that Sgt. Gilchrist already had gloves on before entering the cell, due to the officers' routine and a skin condition suffered by Sgt. Gilchrist. Topp Dep. at p. 67 (docket no. 178-5); Cerka Dep. at p. 83 (docket no. 179-5); Gilchrist Dep. at p. 100 (docket no. 179-1). While this testimony contradicts plaintiff's testimony that Sgt. Gilchrist placed a rubber glove on his right hand shortly before assaulting plaintiff's testicles, the issue of when and where Sgt. Gilchrist put on rubber gloves is a question of fact for the jury.

Finally, the court is faced with defendants' judicial admission that approximately one hour transpired between the time that defendant Hairston delivered breakfast and the time that the five officers encountered plaintiff and placed him in the restraining chair. As discussed in this

14

court's order denying defendants' motion to amend their answer, this judicial admission stands as made. *See* Order (docket no. 281) filed August 30, 2012.

Viewing the evidence in the light most favorable to the non-movant (i.e., plaintiff), the court concludes that genuine issues of material fact exist with respect to plaintiff's excessive force claim. If plaintiff's testimony is to be believed, then defendants rushed his cell for no reason, repeatedly hit his head on cement, held him down, pulled down his pants, snapped his testicles and then strapped him into a restraint chair. Plaintiff's testimony establishes that defendants engaged in the unnecessary and wanton infliction of pain contrary to Eighth Amendment's prohibition of cruel and unusual punishment: plaintiff posed no threat to defendants; there was no need for defendants to apply force; and defendants used force maliciously and sadistically for the very purpose of causing harm. Plaintiff's testimony also describes activity which "shocks the conscience" in violation of plaintiff's substantive due process rights under the Fourteenth Amendment. While plaintiff's testimony describes acts of outrageous behavior, this court must accept plaintiff's version of events for purposes of this motion. *See Liberty Lobby*, 477 U.S. at 255. Accordingly, defendants' motions for summary judgment should be denied as to Count III.

### C. Intentional infliction of emotional distress (Count VII)

Next, plaintiff claims that the actions defendants Topp, Smith, Cerka, Hairston and Gilchrist resulted in an actionable state law tort of intentional infliction of emotional distress. The Sixth Circuit has permitted claims of intentional infliction of emotional distress in Michigan:

> While the Michigan Supreme Court has not yet recognized the tort of intentional infliction of emotional distress, *see Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 374 N.W.2d 905, 906 (1985), the Michigan Court of Appeals has recognized such a tort, and we have assumed that the Michigan Supreme Court would do so too under appropriate circumstances and have therefore permitted such

> claims to proceed. *See DeCoe v. General Motors Corp.*, 32 F.3d 212, 218 (6th Cir.1994).
>
> To establish a *prima facie* case of intentional infliction of emotional distress, a plaintiff must establish four elements: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *See Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 777 (6th Cir.1996) (citing *Roberts*, 374 N.W.2d at 908). The outrageous conduct requirement is satisfied only by conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Roberts*, 374 N.W.2d at 908 (quoting Restatement (Second) of Torts § 46, cmt. d (1965)). Liability arises, moreover, only "where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Id.* at 908-09.

*Andrews v. Prudential Securities, Inc.*, 160 F.3d 304, 309 (6th Cir. 1998).

In *Jones v. Muskegon County*, 625 F.3d 935 (6th Cir. 2010), the court further explained:

> It is not enough that the defendant has acted with an intent that is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort. *Roberts v. Auto–Owners Ins. Co.*, 422 Mich. 594, 602–603, 374 N.W.2d 905 (1985), quoting Restatement Torts, 2d, § 46, comment d, pp. 72–73. In reviewing a claim of intentional infliction of emotional distress, we must determine whether the defendant's conduct is sufficiently unreasonable as to be regarded as extreme and outrageous. *Doe*, *supra* at 92, 536 N.W.2d 824. The test is whether "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " *Roberts*, *supra* at 603, 374 N.W.2d 905.

*Jones*, 625 F.3d at 948, quoting *Graham v. Ford*, 237 Mich. App. 670, 674-75, 604 N.W.2d 713 (1999).

If plaintiff's testimony is to be believed, then defendants rushed his cell for no reason, repeatedly hit his head on cement, held him down, pulled down his pants, snapped his testicles and then strapped him into a restraint chair. Viewing plaintiff's testimony in the light most favorable to the non-moving party (i.e., the plaintiff), the court concludes that the four elements of intentional

16

infliction of emotional distress have been met: the conduct described by plaintiff would qualify as extreme and outrageous; defendants intended to treat plaintiff in that manner; and the treatment caused plaintiff severe emotional distress. For purposes of this motion, the court must accept plaintiff's version of events, which appear in his sworn deposition testimony. *See Scott*, 550 U.S. at 380; *Anderson*, 477 U.S. at 255. Accordingly, defendants' motions for summary judgment on Count VII, intentional infliction of emotional distress arising from the events of March 6, 2008, should be denied.

### IV. Recommendation

For the reasons set forth above, I respectfully recommend that the motions for summary judgment filed by defendants Topp, Smith, Cerka and Hairston (docket nos. 168, 171, 174 and 177) be **DENIED**.

I further recommend that the motion for summary judgment filed by defendant Gilchrist (docket no. 190) be **DENIED in part** as to Count III (excessive force) and as to the claim of intentional infliction of emotional distress alleged in Count VII.

Dated: August 31, 2012 /s/ Hugh W. Brenneman, Jr.
HUGH W. BRENNEMAN, JR.
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).