UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY A. CARL,

        Plaintiff,

v.

COUNTY OF MUSKEGON,
*et al.*,

        Defendants.

_____/

Case No. 1:11-cv-94

Hon. Robert J. Jonker

### REPORT AND RECOMMENDATION

This matter is now before the court on motions for summary judgment[1] filed by the following defendants: Sgt. Brian Bonstell (docket no. 165); Sgt. Theresa-Jones Burton (docket no. 180); Sheriff Dean Roesler (docket no. 186); Sgt. Todd Gilchrist (docket no. 190); Jail Administrator Lt. Mark Burns (docket no. 194); and Muskegon County (docket no. 198). The court's review of these motions is limited to Count II (equal protection).[2]

### I.    Plaintiff's allegations relevant to the Equal Protection claim

In February 2008, plaintiff was employed as a care giver for an elderly couple in Muskegon, Michigan. Amend. Compl. at ¶ 21. Plaintiff was arrested on February 23, 2008, after

---

[1] Some of the motions are incorrectly designated as motions for "summary disposition."

[2] Defendant Nurse Christy Bowen also moved for summary judgment on this issue (docket no. 183). However, Nurse Bowen died on July 30, 2012. *See* Statement noting a party's death (docket no. 261). The court notes that no successor or representative has been appointed for her as required by Fed. R. Civ. P. 25. Because there is no person acting on behalf of this deceased defendant, the court cannot issue a Report and Recommendation addressing her claims. Accordingly, the proceedings are effectively stayed as to this deceased defendant until a successor appears or the defendants is dismissed without prejudice. *See* Fed. R. Civ. P. 25(a)(1).

he urinated on the side of the elderly woman's head and then tried to dispense soap on the woman's husband from a liquid soap dispenser.  *Id.* at ¶¶ 22, 25.   He was charged with two misdemeanors, assault and battery on each client.  *Id.* at ¶ 25.   Plaintiff was evaluated at the Hackley Hospital Emergency Room before his admission to the Muskegon County Jail on February 23rd.  *Id.* at ¶ 26. The attending physician at the emergency room recommended that plaintiff be returned to the jail and evaluated by Community Mental Health Services (CMH).  *Id.*  Plaintiff was subsequently released on bond.  *Id.* at ¶ 25.

On February 27, 2008, plaintiff was re-arrested on felony charges arising from the incident, i.e., two charges of vulnerable adult abuse, 1st degree, M.C.L. § 750.145(1).  *Id.* at ¶ 25. *See* Order for competency evaluation (docket no. 1-9).  Upon arriving at the jail, the booking officer wrote in the inmate log that plaintiff "is suffering from severe mental problems. . . ."  Amend. Compl. at ¶ 27.  Julie McLaughlin, PAC, a physician's assistant with CMH, under the supervision of CMH psychiatrist Zia Khan, M.D., evaluated plaintiff on March 3, 2008, noting that plaintiff: "is not able to join the general population" at the jail and "is floridly psychotic and needs to be treated at a psychiatric facility."  *Id.* at ¶ 28.  McLaughlin further noted that she did not believe that plaintiff "has any understanding why he is in jail or what his behaviors were;" that plaintiff's present prescription for Seroquel "is not very effective;" and that plaintiff should have a treatment plan which included a transfer to the Kalamazoo Psychiatric Hospital "where he will hopefully undergo treatment for his psychosis and this is encouraging."  *Id.*; *See* Physician Progress Note (March 3, 2008) (docket no. 1-3).  Steve Weinert, MA, LLP, an emergency mental health services therapist, accompanied McLaughlin on March 3rd, and completed a "Jail Request for CMH Consultation" for plaintiff.  Amend. Compl. at ¶ 29; Jail Request for CMH Consultation (March 3, 2008) (docket no.

1-4). Weinert wanted to evaluate plaintiff "for danger to self/others" and to determine a course of treatment. *Id.* Weinert characterized plaintiff as paranoid and "preoccupied with a 'glowing light' in his cell that is tugging at his brain," and concluded that "[i]t is this evaluator's impression that [plaintiff] requires intensive psychiatric treatment that would most appropriately be delivered through admission to the Center for Forensic Psychiatry [located in Saline, Michigan]." *Id.* Weinert provided a copy of his request for CMH consultation form to the jail. Amend. Comp. at ¶ 30.

Katherine Jawor, D.O., a psychiatrist utilized by CMH, examined plaintiff on March 5, 2008. *Id.* at ¶ 31. After reviewing the Weinert and McLaughlin's notes from March 3rd and interviewing plaintiff, Dr. Jawor concluded that she would not certify plaintiff for admission to a hospital "because I am seeing nothing to give him a positive cert." *Id.*; *see* CMH Progress Notes (March 5, 2008) (docket no. 1-5). Dr. Jawor noted plaintiff was agreeable to taking his medications at that time. *Id.*

Mr. Weinert evaluated plaintiff two days later on March 7, 2008 to "Evaluat[e] for admission to inpatient hospital." Amend. Compl. at ¶ 32; Jail request for consultation (docket no. 1-6). Weinert noted that plaintiff had been overmedicated by the jail before the evaluation and concluded that plaintiff did not appear to warrant inpatient hospitalization at that time. Amend. Compl. at ¶ 32. Weinert recommended that the jail continue plaintiff's placement in a holding cell and that plaintiff be re-evaluated on Monday (March 10, 2008). *Id.* Weinert provided a copy of his completed "Jail Request for CMH Consultation" form to the jail which, according to plaintiff, informed defendants Lt. Burns, Sgt. Jones-Burton, Sgt. Bonstell, Sgt. Gilchrist and Nurse Bowen of Weinert's March 7, 2008 evaluation. *Id.* at ¶ 33. However, Weinert did not follow up with plaintiff on March 10, 2008 "or at any other time." *Id.* at ¶ 34.

3

Despite being aware of the March 7, 2008 recommendation and the need for a re-evaluation on March 10, 2008, neither Lt. Burns nor any of the command sergeants nor Nurse Bowen provided, requested or arranged further mental evaluations of plaintiff to assess his need for in-patient hospitalization.  *Id.* at ¶ 35.

Lt. Burns authorized plaintiff's release into the general population at the jail on March 9, 2008.  *Id.* at ¶ 38.  Plaintiff became "sicker and sicker" over the next 39 days, "exhibiting bizarre behavior consistent with his obvious illness, such as refusing his medications, meals and showers."  *Id.* at ¶ 40.  Rather than treat plaintiff for his illness, Lt. Burns and "the other members of the jail command" ordered that plaintiff be punished for this behavior by cancelling visits with his parents,  withholding snacks, placing him in lockdown and on one occasion, ordering the use of a "Pepperball Launcher" when plaintiff refused to shower and refused to return to lockdown.  *Id.*

On March 18, 2008, Lt. Burns was "well aware" that plaintiff was seriously ill, "so ill that he was refusing his medication."  *Id.* at ¶ 41.  Burns advised jail staff that they should continue to have plaintiff take the medication.  *Id.*  At this time, Lt. Burns, the defendant Sergeants, Nurse Bowen and Weinert knew that Judge Nolan, the presiding judge in the Muskegon County Circuit Court criminal case against plaintiff, had ordered that plaintiff be evaluated by the Center for Forensic Psychiatry on March 27, 2008.  *Id.* at ¶ 42; Order for competency examination (March 3, 2008) (docket no. 1-9 at p. 2); Order for evaluation relative to criminal responsibility (March 7, 2009) (docket no. 1-9 at p. 3).  Neither Nurse Bowen, Lt. Burns, the defendant Sergeants nor Weinert provided any medical attention or treatment for plaintiff.  Instead they waited to provide treatment until the scheduled March 27, 2008 evaluation of plaintiff's competency to stand trial.

4

*Id.* at ¶ 42.   These defendants took this action "even though they knew that the competency examination had nothing to do with providing Mr. Carl medical treatment."  *Id.* at ¶ 43.

Despite Lt. Burns' direction on March 18, 2008 that the jail staff continue offering plaintiff his medications, plaintiff was not offered any medication until March 24, 2008.  *Id.* at ¶ 44. According to plaintiff, after he refused his medications on March 18, 2008, Nurse Bowen "decided to withhold" the medication.  *Id.*

On March 24, 2008, jail staff informed Lt. Burns that plaintiff was:

> still acting out, aggressive at times, bang[ing] on walls, giggling, talking to "someone" in cell.  When you stop to talk to him he will quickly turn his back to you.  Placing his property out of his cell.  Odd behavior -- still refusing medication.

*Id.* at ¶ 45.  Based on this behavior, Lt. Burns determined that plaintiff was a danger to himself and to jail staff.  *Id.*  However, Lt. Burns failed to provide, request or arrange hospitalization or other medical attention or treatment for plaintiff.  *Id.*

Plaintiff alleged that Sheriff Roesler knew that plaintiff needed psychiatric treatment but disregarded those needs, making statements to the press that plaintiff had behavior problems while in custody at the jail.  *Id.* at ¶ 46.

Nurse Bowen felt that plaintiff was "playing games" by requesting, and then refusing to take, medications.  *Id.* at ¶ 47.  Rather than recognizing plaintiff's "desperate need for help," Nurse Bowen withheld plaintiff's medications from March 24, 2008 until plaintiff's transfer to the Center for Forensic Psychiatry on April 18, 2008.  *Id.*

On March 27, 2008, a staff psychologist at the Center for Forensic Psychiatry evaluated plaintiff in response to Judge Nolan's orders, and reported (in a letter dated March 31, 2008) that although plaintiff seemed willing to cooperate with the interview, he was showing "clear

signs of significant mental disturbance which was interfering with his ability to cooperate." *Id.* at
¶ 49.  The examiner concluded that plaintiff was not in full control of his behavior, not competent
to stand trial, but could be restored to competency if provided with appropriate treatment in a
structured hospital setting.  *Id.*

On April 11, 2008, Judge Nolan held a competency hearing in the Muskegon County
Circuit Court.  *Id.* at ¶ 50.  At the hearing, plaintiff was "barefoot, filthy and unshaven for six
weeks," "had no understanding that he was in a courtroom," and "was unable to communicate with
his lawyer."  *Id.*  Judge Nolan found plaintiff incompetent to stand trial and ordered that he be
transported to a state facility recommended by the Center for Forensic Psychiatry to undergo
treatment to render him competent to stand trial.  *Id.*; Finding and Order on competency (April 11,
2008) (docket no. 1-11).  Despite Judge Nolan's order, none of the defendants provided, requested
or arranged for hospitalization or other medical treatment until plaintiff was transferred to the state
facility.  Amend. Compl. at ¶ 51.  Due to the extreme stress he suffered at the jail, plaintiff lost 49
pounds between the time he was treated at the emergency room on February 23, 2008 (when he
weighed 289 pounds) until his admission to the Center for Forensic Psychiatry on April 18, 2008
(when he weighed 240 pounds).  *Id.* at ¶ 52.

In Count II, plaintiff alleged that defendants Muskegon County, Sheriff Roesler, Lt.
Burns, Sgt. Gilchrist, Sgt. Bonstell, Sgt. Jones-Burton, and Nurse Bowen violated his right to the
equal protection of the laws protected by the Fourteenth Amendment.  *Id.* at ¶ 73.  Specifically,
plaintiff "was denied the medical treatment he urgently required whereas other pretrial detainees
and inmates may have been provided with medical treatment if they suffered from equally urgent

but non-psychiatric medical conditions" and "[t]here was no compelling, important, or even rational basis for treating detainees and inmates unequally in this regard." *Id.*

Plaintiff seeks damages and statutory attorney's fees.

## II.    Legal standard

### A.    Summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted).  "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving

7

party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.  Plaintiff's equal protection claim

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). "To state an equal protection claim, a party must claim that the government treated similarly situated persons differently." *Braun v. Ann Arbor Charter Township*, 519 F.3d 564, 574 (6th Cir. 2008). Plaintiff is bringing this claim under a "class of one" theory, citing (as his only authority) *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), for the proposition that "[w]hen a non-suspect classification is involved, a plaintiff may establish an equal protection claim by showing that similarly situated persons were intentionally

8

treated differently without a rational relationship to a legitimate state purpose." Plaintiff's Response at p. 17 (docket no. 227). The gist of plaintiff's claim is that defendants failed to provide plaintiff, a pre-trial detainee suffering from mental illness, with the same level of care as a "similarly situated" pre-trial detainee suffering from a physical illness. *Id.* at pp. 17-18. Plaintiff, however, provides no legal authority for the proposition that a pre-trial detainee suffering from mental illness can be considered to be similarly situated to a pre-trial detainee suffering from physical illness for purposes of the Equal Protection clause. *Id.*

For their part, defendants' seven briefs in support of summary judgment cite one 22-year-old criminal case, *United States v. Roberts*, 915 F.2d 889 (4th Cir. 1990), which involved a federal sentencing issue. Defendants cite *Roberts* for the unremarkable proposition that "[i]n order to establish that he was denied equal protection of the law, [the criminal defendant] must show that similarly situated persons are subject to disparate treatment, and that this disparate treatment has no rational basis." *See* Sgt. Bonstell's Brief at p. 13 (docket no. 166); Sgt. Jones-Burton's Brief at p. 13 (docket no. 181); Sheriff Roesler's Brief at pp. 13-14 (docket no. 187); Sgt. Gilchrist's Brief at p. 14 (docket no. 191); Lt. Mark Burns' Brief at p. 15 (docket no. 195); Muskegon County's Brief at p. 15 (docket no. 199). Defendants adopt the same legal position, unsupported by any citation to authority, that "[i]t would be logical to believe that there are some differences between the treatment of physically ill inmates and mentally ill inmates, as the Jail uses an outside consultant, CMH, for mental health evaluations, while its own Jail medical department makes evaluations of the physical health of the inmates." *Id.* In short, none of the parties have provided meaningful analysis to assist the court in resolving plaintiff's equal protection claim.

Based upon plaintiff's brief, the gist of his "class of one" claim is that defendants singled him out, for no rational reason, and did not provide him with adequate care for his mental illness.  Specifically, plaintiff argues: "it was the policy and practice of the County not to provide any medical care to a mentally ill inmate or detainee in his situation"; "[t]here is no rational basis for denying medical care to people, like Mr. Carl, in this situation simply because the medical need relates primarily to mental health instead of strictly physical health"; "the County in practice does not render mental health services at the jail except in very limited consultation services . . . [but] [t]here is no such limitation placed on the medical needs available at the jail that are not mental-health related"; and "the practice at the jail is that visits are withheld for mentally ill inmates who refuse their medications, whereas there is no evidence that such a practice is imposed on inmates who are not mentally ill but who still refuse their medications."  Plaintiff's Response at pp. 17-18.

The court concludes that defendants' motion should be granted because the "class of one" theory is not applicable in this case.   This court recently addressed this very issue in *Shoreline Foundation, Inc. v. City of Muskegon*, No. 1:11-cv-343, slip op. at pp. 8-15 (W.D. Mich. Aug. 17, 2012) (Jonker, J.) (docket no. 34).  While *Shoreline Foundation* involved discretionary decisions by local officials to issue permits, the rationale expressed in the court's opinion is equally applicable to the present case, which involves a different type of discretionary decision, i.e., the treatment of a pre-trial detainee at a county jail.  Both *Shoreline Foundation* and the present case lack  "objectively verifiable standards" of treatment which are present in the "class of one" equal protection claims established in *Olech*.  An extensive portion of the court's August 17, 2012 opinion in *Shoreline Foundation* is quoted below:

> Under the Equal Protection Clause, "the states cannot make distinctions [that] . . . burden a fundamental right, target a suspect class, or intentionally treat one

10

different from others similarly situated without any rational basis for the difference." *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 312 (6th Cir. 2005); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). "Where, as here, a plaintiff alleges a violation of the third type, it is said to proceed on a 'class of one' theory." *Taylor Acquisitions, L.L.C v. City of Taylor*, 313 F. App'x 826, 836 (6th Cir. 2009) (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006)); *see also Northville Downs v. Granholm*, 622 F.3d 579, 586 (6th Cir. 2010). Under this theory, a "plaintiff may demonstrate that government action lacks a rational basis either by negativing every conceivable basis which might support government action, or by showing that the challenged action was motivated by animus or ill-will." *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 788 (6th 2005).

The United States Supreme Court first recognized the class-of-one equal protection theory of liability in *Willowbrook v. Olech*, 528 U.S. 562 (2000). Grace and Thaddeus Olech had petitioned the Village of Willowbrook (the "Village") to connect their property to the municipal water supply. *Id.* at 563. The Village conditioned the connection on the Olechs granting it a 33-foot easement. *Id.* The Olechs objected, asserting that other property owners requesting access to the Village water supply were only required to provide a 15-foot easement. *Id.* After a three-month delay, the Village agreed to provide the Olechs with a connection in return for the 15-foot easement. *Id.* Shortly thereafter, the Olechs filed suit, "claiming that the Village's demand of an additional 18-foot easement violated the Equal Protection clause of the Fourteenth Amendment." *Id.* The District Court dismissed the Complaint under Rule 12(b)(6) for failing to state a claim, but the Seventh Circuit Court reversed. In a four-page per curiam opinion, the Supreme Court held that the Olechs had stated a cognizable "class of one" equal protection claim because they alleged the Village had intentionally treated them differently from others similarly situated, "quite apart from the Village's subjective motivation," and that there was no rational basis for the difference in treatment. *Id.*

The Supreme Court did not revisit the class-of-one theory until eight years later in *Engquist v. Oregon Dep't of Agriculture*, 553 U.S. 591 (2008), in the public employment context. In *Engquist*, the Supreme Court held that the class-of-one theory did not apply to government's decisions regarding employment as a matter of law. *Id.* In reaching its decision, the Supreme Court "did not disturb the holding or the rationales of *Olech* and its predecessors, because it agreed that a class-of-one claim is generally available to one who alleges that a government discriminated against him by irrationally departing from a clear, objective standard." *JDC Management, LLC v. Reich*, 644 F. Supp. 2d 905, 920–21 (W.D. Mich. 2009). In *Olech*, the aggrieved party asserted that all property owners applying for water connection were required to provide a 15-foot easement, but that they were required to provide a 33-foot easement. This clear, objective departure from the alleged

standard easement requirement permitted a class-of-one equal protection claim to survive a Rule 12(b)(6) challenge.

However, the Supreme Court distinguished *Olech* from cases that involve inherently discretionary decisions involving subjective, individual-specific determinations. As Chief Justice Roberts, writing for the majority, explained:

> There are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that "people should be treated alike, under like circumstances and conditions," is not violated when one person is treated differently than others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

Engquist, 553 U.S. at 603. While Chief Justice Roberts noted that "this principle applies most clearly in the employment context," it was not limited to employment. *Id.* at 604. In short, an inescapable consequence of committing some governmental decisions to the discretion of the decision-maker, rather than to the rigors of an objective and verifiable standard, is some deferential treatment.

Relying on this principle, numerous courts, including several within this District, have declined to extend the class-of-one theory to alleged conduct that involves the same type of discretionary, subjective decision-making that was present in *Engquist*. *See, e.g., Argue v. Burnett*, 2010 WL 1417633, at *14 (W.D. Mich. Apr. 1, 2010) (Maloney, C.J.); *JDC Management, LLC*, 644 F. Supp. 2d at 925 (Maloney, C.J.); *Green v. Livingston*, 2009 WL 1788319, at * 4 (W.D. Mich. June 19, 2009) (Bell, J.) (holding class-of-one theory was inapplicable to parole board decision to grant or deny parole); *Robertson v. City of Grand Rapids*, 2008 WL 4822218, at *9–*10 (W.D. Mich. Nov. 4, 2008) (Scoville, M.J.) ("[I]n *Engquist* . . . [t]he Supreme Court held that the 'class-of-one' theory was not appropriate for areas involving discretionary determinations . . . ."); *Gast v. Tenn. Valley Authority*, 2011 WL 864390, at *9 (Mar. 10, 2011); *see also U.S. v. Moore*, 543 F.3d 891, 900 (7th Cir. 2008) ("[The] class-of-one equal protection theory is a 'poor fit' where the challenged governmental action is the product of a broadly discretionary decision-making process."); *Cordi- Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) ("The *Olech* class of one suit serves an important but relatively narrow function. It is not a vehicle for federalizing run-of-the-mill zoning, environmental, and licensing decisions."); *Crippen v. Township of Hempstead*, 2009 WL 803117 (E.D.N.Y. Mar. 25, 2009) (requiring plaintiff to demonstrate that differential treatment was the result of non-discretionary state action to proceed on class-of-one

12

claim); *Seymour's Boardyard, Inc. v. Town of Huntington*, 2009 WL 1514610 (E.D.N.Y. June 1, 2009) (holding township's decision to revoke plaintiff's license to operate a boat launch was not subject to class-of-one analysis); *Tarantino v. City of Hornell*, 615 F. Supp. 2d 102, 112 (W.D.N.Y. 2009) (class-of-one challenge to town code provisions governing rental property was not subject to class-of-one analysis based on inherent discretionary authority of township); *Upthegrove v. Holm*, 2009 WL 1296969, at *1 (W.D. Wisc. May 7, 2009) (holding class-of-one theory inapplicable to prison employee's decision regarding inmate dress); *Bissessur v. Ind. Univ. Bd. of Trustees*, 2008 WL 4274451, at *9 (S.D. Ind. Sept. 10, 2008) (holding Engquist bars class-of-one challenge to school district's decision to expel student); *Siao-Pao v. Connolly*, 564 F. Supp. 2d 232, 245 (S.D.N.Y. 2008) (holding *Engquist* bars challenge to parole board's decision to deny parole); *Harmon v. St. Louis Cty.*, 2009 WL 880024 (E.D.Mo. Mar. 30, 2009) (dismissing class-of-one claim based on plaintiff's alleged mistreatment after automobile accident with a county police officer). These cases ensure that discretionary governmental action remains truly discretionary and beyond the scope of judicial second-guessing.

*Engquist* involved an employment decision, not a permitting decision, but the reasoning of *Engquist* applies with equal force in both scenarios, and the Court sees no principled basis to distinguish between them. It is undisputed that the City and the Commission are vested with the discretionary authority to grant or deny festival permits. It is also undisputed that a number of subjective factors inform whether a permit should ultimately issue. The evidence of record bolsters these conclusions, with a number of subjective and discretionary considerations informing the permitting process, including the projected attendance, location, date availability, past involvement with the festival promoter applying for the license, and potential benefit or risks to the City. The record does not disclose the kind of objectively verifiable standards, like the *Olech* easement, that dictate the grant or the denial of a permitting decision. Applying the class-of-one analysis to such a discretionary, subjective decision would require the Court to serve as a "super-legislature," secondguessing the decision-making of elected and appointed officials based on a disfavorable outcome to a particular party. As the Tenth Circuit cautioned before *Engquist* was even decided:

> unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decisions made by state actors. It is always possible for persons aggrieved by government to allege, and almost always possible to produce evidence, that they were treated differently than others, with regard to everything from zoning to licensing to speeding to tax evaluation. It would become the task of federal courts and juries, then, to inquire into the grounds for differential treatment and to decide whether those grounds were sufficiently reasonable to satisfy equal protection

13

> review.  This would constitute the federal courts as general-purpose
> second-guessers of the reasonableness of broad areas of state and
> local decision-making: a role that is both ill suited to the federal
> courts and offensive to state and local autonomy in our federal
> system.

*Jennings v. City of Stillwater*, 383 F.3d 1199, 1210–11 (10th Cir. 2004).

*Shoreline Foundation* , 1:11-cv-343, slip op. at pp. 8-13 (Aug. 17, 2012).

After reviewing the allegations set forth in the amended complaint and the relevant matters of record, the court concludes that a class-of-one theory is not legally applicable to plaintiff. Defendants in this matter played different roles in operating the Muskegon County Jail.  Each day, defendants were required to make "inherently discretionary decisions involving subjective, individual-specific determinations"  regarding plaintiff's treatment while he was being held at the jail.  Each of these decisions made by defendants impacted not only plaintiff, but also the jail staff who were in contact with plaintiff.  Unlike the plaintiffs in *Olech*, there are no objectively verifiable standards applicable to plaintiffs in this case.  Individuals require different types of treatment for their particular mental or physical illness.  To allow plaintiff to bring a class-of-one equal protection claim contesting the adequacy of his treatment for mental illness in the Muskegon County Jail would stray far from the constitutional guarantee of equal protection, and would require this court to act as a "general-purpose second-guesser" of every interaction that occurred between plaintiff and the jail staff concerning his mental issues, an inherently subjective area.  Accordingly, defendants' motions for summary judgment should be granted as to plaintiff's class of one equal protection claim.

14

### III.    Recommendation

For the reasons set forth above, I respectfully recommend that the motions for summary judgment filed by defendants Sgt. Bonstell (docket no. 165), Sgt. Jones-Burton (docket no. 180), Sheriff Roesler (docket no. 186), Sgt. Gilchrist (docket no. 190), Lt. Burns (docket no. 194) and Muskegon County (docket no. 198) be **GRANTED** with respect to Count II (the equal protection violation).


Dated:  August 31, 2012                              /s/ Hugh W. Brenneman, Jr.
                                                     HUGH W. BRENNEMAN, JR.
                                                     United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).