UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY A. CARL,

             Plaintiff,

v.

COUNTY OF MUSKEGON,
*et al.*,

             Defendants.

_____/

Case No. 1:11-cv-94

Hon. Robert J. Jonker

## REPORT AND RECOMMENDATION

       This matter is now before the court on motions for summary judgment filed by the following defendants: Muskegon County (docket no. 198); Muskegon County Sheriff Dean Roesler (docket no. 186); Mark Burns (command lieutenant and administrator of the Muskegon County Jail (the "Jail")) (docket no. 194); Brian Bonstell (command sergeant at the Jail) (docket no. 165); Theresa Jones-Burton (command sergeant at the Jail) (docket no. 180); Todd Gilchrist (command sergeant at the Jail) (docket no. 190); Christy Bowen (nurse at the Jail) (docket no. 183)[1]; and Steve Weinert (limited licensed psychologist with Muskegon County Community Mental Health (CMH)) (docket no. 210). This report will review these motions with respect to plaintiff's claim for deliberate indifference as alleged in Count 1.[2]

_____

       [1] Defendant Nurse Christy Bowen is deceased. As of October 2, 2012, her interests are being represented by Leonard Bethke and Brendan Bowen, Personal Representatives of the Estate of Christy Bowen. *See* Order for substitution of a deceased defendant (docket no. 306).

       [2] The court addressed plaintiff's other claims in four previous Reports. *See* docket nos. 280, 282, 283 and 309. In addition, on November 27, 2012, the court dismissed plaintiff's state law claims alleged in Counts 4, 5, 6 and 7. *See* docket no. 312.

# I.    Plaintiff's allegations regarding deliberate indifference

In Count I, brought pursuant to 42 U.S.C. § 1983,  plaintiff alleged that Muskegon County, Sheriff Roesler, Lt. Burns, Sgt. Gilchrist, Sgt. Jones- Burton, Sgt. Bonstell, Nurse Bowen, Mr. Weinert, and Dr. Katherine Jawor were deliberately indifferent to his serious medical needs in violation of the Eighth and Fourteenth Amendments.  Amend. Compl. at ¶¶ 57-71.[3]  Plaintiff's allegations of deliberate indifference are summarized below.

In February 2008, plaintiff was employed as a caregiver for an elderly couple in Muskegon, Michigan.  Amend. Compl. at ¶ 21.  Plaintiff was arrested on February 23, 2008, after he urinated on the side of the elderly woman's head and then tried to dispense soap on the woman's husband from a liquid soap dispenser.  *Id.* at ¶¶  22, 25.   He was charged with two misdemeanors, assault and battery, on each client.  *Id.* at ¶ 25.   Upon plaintiff's booking at the Jail, Lt. Burns was aware that plaintiff was suffering from serious mental health problems and instructed the arresting officer to transport plaintiff to the Hackley Hospital emergency room for evaluation.  *Id.* at ¶ 26.  The attending physician at the emergency room recommended that plaintiff be returned to the jail and evaluated by CMH.  *Id.*  Plaintiff was subsequently released on bond.  *Id.* at ¶ 25.

On February 27, 2008, plaintiff was re-arrested on felony charges of vulnerable adult abuse, 1st degree, M.C.L. § 750.145(1), arising from the incident.  *Id.* at ¶ 25.  *See* Order for competency evaluation (docket no. 1-9).  He was transported to the Jail where the booking officer wrote in the Inmate Log that plaintiff  was "suffering from severe mental problems."  Amend. Compl. at ¶ 27.  The Inmate Log also reflected that plaintiff's medication was received by the jail.  *Id.*

---

[3] The court addressed plaintiff's claims against Dr. Jawor in a  previous Report.  *See* docket no. 280.

On March 3, 2008 Jule McLaughlin, a physician's assistant (PA) with CMH, under the supervision of CMH psychiatrist Zia Khan, M.D., evaluated plaintiff at the Jail. *Id.* at ¶ 28. Mr. Weinert accompanied PA McLaughlin and completed a "Jail Request for CMH Consultation." Amend. Compl. at ¶ 29; Jail Request for CMH Consultation (March 3, 2008) (docket no. 1-4). The purpose of their visit was to evaluate plaintiff "for danger to self/others" and to determine a course of treatment. *Id.* PA McLaughlin noted that plaintiff was not able to join the general population at the Jail, was floridly psychotic, and needed to be treated at a psychiatric facility. *Id.* at ¶ 28.[4] McLaughlin further noted: that plaintiff did not understand why he was jail; that plaintiff's present prescription for Seroquel was not very effective; and that plaintiff should have a treatment plan which included transfer to the Kalamazoo Psychiatric Hospital to undergo treatment for his psychosis. *Id.*; *See* Physician Progress Note (March 3, 2008) (docket no. 1-3). For his part, Mr. Weinert characterized plaintiff as paranoid and "preoccupied with a 'glowing light' in his cell that is tugging at his brain." Amend. Compl. at ¶ 29; Jail Request for CMH Consultation (March 3, 2008) (docket no. 1-4). Mr. Weinert concluded that "[i]t is this evaluator's impression that [plaintiff] requires intensive psychiatric treatment that would most appropriately be delivered through admission to the Center for Forensic Psychiatry [CFP]." *Id.* Mr. Weinert provided a copy of his request for CMH consultation form to the jail. Amend. Comp. at ¶ 30.

That same day, 60th District Court Judge Nolan, who was presiding over plaintiff's criminal cases, entered orders directing the CFP to examine plaintiff on the issues of his competency to stand trial and his criminal responsibility. *Id.* at ¶ 42; Order for a competency evaluation (docket

---

[4] PA Jule McLaughlin is sometimes referred to by the parties as Julie McLaughlin.

no. 1-9 at p. 2); Order for evaluation relative to criminal responsibility (docket no. 1-9 at p. 3). The CFP evaluations were scheduled for March 27, 2008. Amend. Compl. at ¶¶ 42-43.

Defendant Katherine Jawor, D.O., whom plaintiff identified as a CMH psychiatrist, examined plaintiff on March 5, 2008. *Id.* at ¶ 31. After reviewing Weinert and McLaughlin's notes from March 3rd and interviewing plaintiff, Dr. Jawor concluded that she would not certify plaintiff for admission to a hospital, noting that she nothing at that time to suggest to support the certification. Amend. Comp. at ¶ 31; *see* CMH Progress Notes (March 5, 2008) (docket no. 1-5).

Mr. Weinert evaluated plaintiff on Friday, March 7, 2008, to determine whether plaintiff should be hospitalized. Amend. Compl. at ¶ 32.[5] After noting that plaintiff "had been overly-medicated by the jail shortly before his evaluation," Weinert concluded that plaintiff did not appear to warrant inpatient hospitalization at the time of the afternoon evaluation. *Id.* Under these circumstances, Weinert recommended that the jail continue to hold plaintiff in a holding cell, and that he be re-evaluated on the following Monday (March 10, 2008). *Id.*

Plaintiff alleged that defendants Lt. Burns, Sgt. Jones-Burton, Sgt. Bonstell, Sgt. Gilchrist and Nurse Bowen became aware of Mr. Weinert's March 7th evaluation when Weinert provided the copy of his completed "Jail Request for CMH Consultation" form to the Jail. *Id.* at ¶ 33. Mr. Weinert did not follow up with plaintiff on Monday, March 10, 2008, or at any other time. *Id.* at ¶ 34. Despite being aware of Mr. Weinert's recommendations that plaintiff required intensive psychiatric treatment, neither Lt. Burns, the command sergeants, nor Nurse Bowen provided, requested or arranged for any psychiatric treatment for plaintiff except offering plaintiff his

---

[5] The court notes that the amended complaint contains an apparent clerical error, listing the date of Mr. Weinert's evaluation as March 7, 2010 rather than March 7, 2008.

medications for a time, which, as a further sign of his deteriorating condition, plaintiff often refused." *Id.* at ¶ 36.

On March 9, 2008, Lt. Burns authorized plaintiff's release into the general population at the Jail. *Id.* at ¶ 38. On March 10, 2008, plaintiff did not recognize his parents during a visit. *Id.* at ¶ 39. The command sergeant who allowed the visit, non-party Sgt. Wood, asked plaintiff's parents if his behavior was normal, to which his mother answered that it was not. *Id.* Over the next 39 days, plaintiff "became sicker and sicker, exhibiting bizarre behavior consistent with his obvious illness, such as refusing his medications, meals and showers." *Id.* at ¶ 40. As documented in Jail records, including the Inmate Log, Jail staff informed Lt. Burns and the command sergeants of this odd behavior. *Id.* Rather than providing medical attention or treatment, Lt. Burns and the other members of the jail command ordered that plaintiff be punished for his behavior by cancelling scheduled visits with his parents, withholding snacks and placing him in lockdown. *Id.* In addition, Sgt. Jones-Burton authorized Jail staff to shoot plaintiff with a "Pepperball Launcher" when he was let out of lockdown for a shower, but then refused to shower or return to lockdown. *Id.*

By March 18, 2008, Lt. Burns, the defendant sergeants, and Mr. Weinert knew that Judge Nolan had ordered that plaintiff be evaluated by the CFP later that month. *Id.* at ¶ 42. When plaintiff refused to take his medication on that day, Lt. Burns knew that plaintiff was mentally ill, but ordered him to be punished by being held in lockdown until he would begin taking his medications. *Id.* at ¶ 41. When Nurse Bowen informed Mr. Weinert, Lt. Burns and the defendant sergeants that plaintiff refused his medication on that date, the defendants did nothing to treat his condition, but chose to wait for the competency evaluation scheduled for March 27, 2008, even though they knew that the evaluations ordered by Judge Nolan were for the purpose of determining

whether plaintiff was legally competent to stand trial, not to assess his healthcare needs. *Id.* at ¶¶ 42-43.

Despite Lt. Burns' directive, plaintiff was offered medications once between March 19, 2008 and April 18, 2008 (the date he was transferred to CFP). *Id.* at ¶¶ 44-48. According to plaintiff, he was denied medication because Nurse Bowen decided to withhold the medication after he refused them on March 18th. *Id.* at ¶ 44.

Plaintiff was offered medication on March 24, 2008. *Id.* at ¶ 48. On that date, as documented in the Inmate Log, Jail staff informed Lt. Burns that plaintiff was

> [S]till acting out, aggressive at times, bang[ing] on walls, giggling, talking to "someone" in cell. When you stop to talk to him he will quickly turn his back to you. Placing his property out of cell. Odd behavior – still refusing medication.

*Id.* at ¶ 45. Based on this continuing behavior, Lt. Burns determined that plaintiff was a danger to himself and to jail staff. *Id.* However, Lt. Burns failed to provide, request or arrange for hospitalization or any medical attention or treatment for plaintiff. *Id.* Nurse Bowen claimed that plaintiff was "playing games," by requesting and then refusing to take his medications. *Id.* at ¶ 47. For this reason, Nurse Bowen decided to permanently plaintiff's medications until he was transferred to the CFP on April 18, 2008. *Id.* Lt. Burns and the command sergeants were aware that plaintiff was not being offered his medications, because Nurse Bowen wrote in the Inmate Log that she "pulled the meds again along with the [medication] cards." *Id.* at ¶ 48.

On March 27, 2008, a staff psychologist from the CFP evaluated plaintiff's competency to stand trial for the pending criminal charges. *Id.* at ¶ 49. In a letter dated March 31, 2008, the evaluator reported to Judge Nolan that although plaintiff seemed willing to cooperate with the interview, he was showing "clear signs of significant mental disturbance which was interfering

with his ability to cooperate" and that because of his illness, plaintiff was not in full control of his behavior and was not competent to stand trial. *Id.* The evaluator further concluded that plaintiff could be restored to competency if provided with appropriate treatment in a structured hospital setting. *Id.*

On April 6, 2008, Sgt. Jones-Burton wrote in the Inmate Log that "[i]t should be noted that [plaintiff] has not had any meds since returning from forensics [on March 27, 2008]." *Id.* at ¶ 48.

On April 11, 2008, Judge Nolan held a competency hearing in the criminal proceedings. *Id.* at ¶ 50. Plaintiff was brought into the courtroom "barefoot, filthy and unshaven for six weeks," had no understanding that he was in a courtroom and was unable to communicate with his lawyer. *Id.* Judge Nolan found that plaintiff was incompetent to stand trial and ordered that he be transported to a state facility to undergo treatment to render him competent to stand trial. *Id.* Despite Judge Nolan's order, defendants did not provide, request or arrange "for any hospitalization or any other medical attention or treatment whatsoever for [plaintiff] before he was transferred to the Center for Forensic Psychiatry on April 18, 2008." *Id.* at ¶ 51. Upon his admission to the CFP, plaintiff weighed 240 pounds, having lost 49 pounds since his initial arrest on February 23, 2008. *Id.* at ¶ 52.

Sheriff Roesler made certain statements reported in the press about plaintiff's behavior problems while he was in custody at the Jail. *Id.* at ¶ 46. Based on these statements, plaintiff alleged that Sheriff Roesler knew that plaintiff needed psychiatric treatment, but disregarded those needs. *Id.*

Plaintiff has alleged that he suffered the following injuries as a result of defendants' actions. He lost weight due to the extreme stress he suffered while being denied medical attention for seven weeks at the jail. *Id.* at ¶¶ 52-53. He endured extreme and inhumane mental distress for seven weeks as defendants "were content to let [plaintiff] fester in an uncontrolled psychotic state without help." *Id.* at ¶ 53. Defendants' failure to provide plaintiff medical treatment "caused serious harm to his mental health" and posed "a serious risk to his physical health." *Id.* Finally, plaintiff alleged that it took him "two years to feel recovered" from the 2008 psychotic episode. *Id.* at ¶ 56. This was a much longer recovery time than plaintiff experienced in his previous "psychotic breaks" in 2001 and 2002 when he "made a complete recovery within four months" and was able to resume his studies. *Id.* In his claim for relief, plaintiff seeks a declaration that defendants' conduct was unlawful, money damages, punitive damages, statutory attorney's fees, costs of suit and other unspecified relief. *Id.* at p. 19.

## II. Legal standard applicable to motions for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. Discussion

### A. Legal standard for Count I (Deliberate Indifference)

Plaintiff contends that defendants' failure to provide medical attention violated his Eighth and Fourteenth Amendment rights. He seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him

of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is undisputed that plaintiff was held at the Jail as a pre-trial detainee. Given this status, his deliberate indifference claim is reviewed under the Fourteenth Amendment rather than the Eighth Amendment. The Sixth Circuit explained the standard of review for a pre-trial detainee's claim of deliberate indifference in *Jones v. Muskegon County*, 625 F.3d 935 (6th Cir. 2010):

> The Eighth Amendment "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward [his] serious medical needs." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir.2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). [Plaintiff], as a pretrial detainee, is "analogously protected under the Due Process Clause of the Fourteenth Amendment." *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).
>
> A Section 1983 claim asserting "[a] constitutional [violation] for denial of medical care has objective and subjective components." *Id.* The objective component requires the existence of a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citation omitted). Such a medical need has been defined as one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir.2008) (citations omitted). The subjective element requires "an inmate to show that prison officials have 'a sufficiently culpable state of mind in denying medical care.' " *Blackmore*, 390 F.3d at 895 (quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir.2000) ). Officials have a sufficiently culpable state of mind where officials act with "deliberate indifference" to a serious medical need. *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970 (citations omitted). The Supreme Court has defined "deliberate indifference" as being more than mere negligence but less than acting with purpose or knowledge. *Id.* at 835, 114 S.Ct. 1970. Instead, the prison official must have acted with a state of mind similar to recklessness. *Id.* at 836, 114 S.Ct. 1970. Thus, to prove the required level of culpability, a plaintiff must show that the official: (1) subjectively knew of a risk to the inmate's health, (2) drew the inference that a substantial risk of harm to the inmate existed, and (3) consciously disregarded that risk. *Id.* at 837, 114 S.Ct. 1970; *see also Cooper v. County of Washtenaw*, 222 Fed.Appx. 459, 466 (6th Cir.2007); *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir.1994).

*Jones*, 625 F.3d at 941.

### B.     Muskegon County

### 1.     Deliberate indifference (failure to provide medical treatment)

While counties may not be held vicariously liable under 42 U.S.C. § 1983 for the actions of their employees or agents, they "may be held directly liable for a constitutional violation committed through a county policy or practice." *Jones*, 625 F.3d at 946, citing *Monell v. New York City Department of Social Services*, 436 U.S. 658, 694 (1978) and *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988). However, "[l]iability may be imposed on a county only when a county policy or custom caused the plaintiff's injury and a direct causal link existed between the policy and the purported denial of the right to adequate medical care. *Jones*, 625 F. 3d at 946 (internal quotation marks omitted). Where no formal policy exists, "the critical question is whether there is a particular custom or practice that 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.'" *Id.*, quoting *McClendon v. City of Detroit*, 255 Fed.Appx. 980, 982 (6th Cir.2007) and quoting *Praprotnik*, 485 U.S. at 127. A municipality's liability may attach for policies promulgated by the official vested with final policymaking authority for the municipality. *Miller v. Calhoun County*, 408 F.3d 803, 813 (6th Cir. 2005). Whether a particular individual is such a policymaker for purposes of § 1983 liability is a question of state law. *Id.*

Plaintiff has alleged that Muskegon County, acting though its Sheriff's Department and CMH, violated his constitutional rights because defendants' failure to treat his serious medical needs was pursuant to the County's "official custom and practice" and therefore, the *de facto* policy of the Jail. Amend. Compl. at ¶ 65. Specifically, plaintiff alleged that it was the custom and practice of the Jail "to handle pretrial detainees and inmates with mental health needs in the manner

11

that [plaintiff] was handled in this case, i.e., unless hospitalized, a mentally ill detainee or inmate would not receive any mental health treatment whatsoever beyond monitoring by jail staff and, if the detainee or inmate had prescription medications, offering the detainee or inmate the medications, at least until the detainee or inmate refused a number of times." *Id.* at ¶ 66 (docket no. 27).

As an initial matter, the parties do not agree as to the policies, customs and practices in force at the Jail. Muskegon County points out that the "Jail has many policies regarding the care of mentally ill inmates in the Jail." Muskegon County's Brief at p. 5 (docket no. 199). While Muskegon County does not enumerate these policies, the court has gleaned the following policies from its brief: (1) that each inmate has a "medical intake" obtained during their booking pursuant to the Jail SOP (docket no. 200-4); (2) that each inmate has a physical examination performed within the first 14 days of incarceration pursuant to the Michigan Department of Corrections (MDOC) Rule 791.732 (docket no. 200-5); (3) that housing placement of inmates requires consultation between the Jail doctor and the corrections staff pursuant to the Jail Medical Manual (docket no. 201-2); (4) that "[t]here is a Policy and Procedure of the Jail that mentally ill inmates be held in a temporary holding cell until cleared by the medical department to be housed elsewhere" (Roesler Dep. at pp. 57-58) (docket no. 202-1); (5) that a practice in the Jail has been that when medications are repeatedly refused by an inmate, the medications are "pulled," meaning "that the medications are taken off the Jail floor and returned to the medical department" (Nurse Bowen Dep. at pp. 48, 51, 64-65) (docket no. 202-2); (6) that a practice in the Jail was that corrections officers report unusual inmate behavior to their command officers and to the Jail's medical department (docket no. 203-1); (7) that a practice in the Jail was that corrections officers reported an inmate's refusal to take medications to their command officers and to the medical department (docket no. 203-2); (8) that

the Jail has a practice of treating inmates with physical and mental health problems the same (docket nos. 202-1 and 204-1); and, (9) that "[w]hen an inmate's unusual behavior is encountered that is believed by the medical department to represent a serious mental health problem . . . the practice of the medical department is to refer the inmate to CMH for evaluation" (docket no. 204-2). Muskegon County's Brief at pp. 5-10. Muskegon County contends that it had these policies in place to treat mentally ill inmates and detainees and that none of the policies caused plaintiff's alleged injuries. *Id.* at pp. 12-14. However, the County admits that some of these policies were violated with respect to plaintiff. *Id.*

   In his response, plaintiff identified eight policies, customs or practices at the Jail which he claims were deliberately indifferent to his serious medical needs:

> (1) anti-psychotic medications will be withdrawn if refused on three or four occasions by a mentally ill inmate or detainee, without notifying the prescribing authority and without the prescribing authority's permission;
>
> (2) no mental health services are available to a mentally ill inmate or detainee who is not certified for involuntary commitment to an inpatient facility; although medications will be offered to the inmate in that case, the medications will be withdrawn after several refusals and no mental health services will be provided;
>
> (3) medical orders are routinely overridden by the sheriff and the jail administrator, creating two sets of orders at the jail — one order from the medical professional and a second, overriding order from the sheriff or jail administrator;
>
> (4) all decisions involving medical including psychiatric judgment are not reserved to the sole discretion of an appropriate medical professional as required by Michigan law but are left to the discretion of jail command;
>
> (5) mental health screenings are not done at the jail as required by Michigan law;
>
> (6) medical evaluations are not performed on all inmates as required by Michigan law within 14 days of arrival at the jail;
>
> (7) decisions to hold mentally ill inmates and detainees in lockdown as a result of their refusal to take prescribed anti-psychotic medications are left to the discretion

of the command staff even though Michigan law and the jail's purported written policies prohibit corporal punishment (and even though corporal punishment has no application in any event to pretrial detainees); and

(8) visits are withheld for a mentally ill inmate or detainee who refuses to take anti-psychotic medications.

Plaintiff's Response at pp. 14-15 (docket no. 227); Plaintiff's Appx. at ¶¶ 137, 198-224 (docket no. 228).

As an initial matter, three of the offending policies identified by plaintiff (nos. 5, 6, and 7), are not "policies" but rather claims that the County's officers and employees violated or failed to follow existing policies or provisions of Michigan state law. Of the remaining five policies identified by plaintiff, policy no. 1 (pulling medications from jail detainees who refuse them) appears to be one of the policies identified by Muskegon County. However, policies no. 2 (no mental health services are available to a mentally ill detainee who is not certified for involuntary commitment), no. 3 (the sheriff and jail administrators routinely override medical orders), no. 4 (all decisions regarding medical treatment are left to the discretion of jail command), and no. 8 (visits are withheld for a mentally ill detainee who refuses to take anti-psychotic medications) are not identified by defendants. Plaintiff has provided a factual basis for these policies in his appendix[6], portions of which are reproduced below:

210. It was the custom and practice at the jail in 2008 that if an inmate or detainee being offered medications refused the medications for several days, those medications would be withdrawn without direction from the prescribing authority. Exhibit 24, Applegarth Deposition, page 17-18; Exhibit 18, Yonker Deposition, page 88-89. See also Exhibit 22, Port Deposition, page 63-64; Exhibit 10, Malenko Deposition, page 36-39; Exhibit 25, Jackowski Deposition, page 27. Sheriff Roesler testified that if an inmate refuses medication, it is within the discretion of the officer

---

[6] As part of his response to defendants' motions for summary judgment, plaintiff filed a 224-paragraph appendix which included citations to 106 exhibits. *See* Appendix and Exhibits (docket nos. 228 through 249).

in charge of the floor to remove the medication from the floor. Exhibit 5, Roesler Deposition, page 75. See also Exhibit 4, Burns Deposition, page 173-174. It was not the practice of the jail to inform the jail doctor, CMH, or anyone else of the refusal. Exhibit 18, Yonker Deposition, page 88-89.

211.   Unless an inmate or detainee suffering from a mental illness at the jail is determined by CMH to meet the standard for involuntary commitment, the custom and practice at the jail is that the person will not be admitted to the hospital. Exhibit 3, Bowen Deposition, page 147-149. The custom and practice at the jail is that a detainee suffering from a mental illness but who is not hospitalized does not receive any mental health treatment except that his medications are offered to him. And if he refuses his medications for three or four days, the custom and practice is that the medications will be pulled and removed from the floor. Exhibit 3, Bowen Deposition, page 150.

212.   William Yonker, a nurse with 23 years of experience at the jail, echoed the same testimony of Nurse Bowen, above, as to the custom and practice at the jail regarding inmates and detainees who are not certified for involuntary commitment. Mr. Yonker can say with confidence that if an inmate or detainee refused medications three times in a row at the jail, the medications likely would no longer be offered. Exhibit 18, Yonker Deposition, page 165. Based on his 23 years at the jail, it was his understanding that if a person suspected of having a mental illness was evaluated by CMH and determined by CMH not to meet the standard for involuntary commitment, the person would not be hospitalized by CMH. And in that case, if the person had been prescribed medications, those medications would be offered until the person refused the medications three times in a row. Exhibit 18, Yonker Deposition, page 166. No further mental health services would be available to the person. Exhibit 18, Yonker Deposition, page 92-93.

213.   Sheriff Roesler testified that his jail command staff have his authority to hold an inmate in lockdown in response to the inmate refusing to take psychiatric medications. "That would be an option that jail command could exercise if they determined it to be appropriate." Exhibit 5, Roesler Deposition, pages, 79-80. However, Sgt. Gilchrist admits that if an inmate were locked down for refusing medications, this would constitute corporal punishment. Exhibit 14, Gilchrist Deposition, page 52. The authority given by Sheriff Roesler to his command staff to hold an inmate in lockdown for refusing psychiatric medications is in conflict with Michigan's administrative rules for jails, which require a facility to establish and maintain written policy, procedure, and practice that protects inmates from corporal punishment. Mich Admin Code R 791.718. Sheriff Roesler's testimony also contradicts his own jail's purported written policy that requires that there be a consultation between the jail administrator and the jail doctor or his designee before an inmate or detainee with a mental illness is disciplined. Exhibit 78, MC 347.

214. Sgt. Greg Wood confirmed that it is a practice at the jail to withhold visits from mentally ill inmates or detainees refusing to take their psychiatric medications. Exhibit 23, G. Wood Deposition, page 45. Sheriff Roesler testified that his jail command staff have his authority to withhold visits for a mentally ill inmate or detainee who is refusing to take psychiatric medications. "This is within the supervisor's decision-making authority." Exhibit 5, Roesler Deposition, page 81. Withholding visits for a mentally ill inmate or detainee refusing medications is unethical in Nurse Bowen's opinion. Exhibit 3, Bowen Deposition, page 70.

Plaintiff's Appx. at ¶¶ 211-12 and 214 (docket no. 228).

The parties agree that Muskegon County had a policy, custom or practice of pulling medication from detainees who refused them. Viewing the evidence in the light most favorable to the non-moving party, genuine issues of material fact exist with respect to whether Muskegon County also adopted the policies, customs and practices identified by plaintiff as policy nos. 2, 3, 4 and 8. This factual question regarding which policies, customs and practices were in force at the Jail is sufficient to defeat defendants' motion for summary judgment.

Assuming that the County utilized some or all of these policies, customs and practices, none of these policies, customs or practices create a mechanism to provide treatment to a mentally ill detainee who, like plaintiff, refuses to take his prescribed antipsychotic medication. Defendants contend that they had no duty to treat plaintiff, because he had a constitutional right to refuse treatment.

Resolution of this issue begins with the Supreme Court's decision in *Washington v. Harper*, 494 U.S. 210 (1990), which recognized that a prison inmate with a serious mental illness has a constitutionally-protected liberty interest in avoiding the unwanted administration of antipsychotic drugs. In *Harper*, the court concluded that an inmate "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment" and that "[t]he forcible injection of medication into a

16

nonconsenting person's body represents a substantial interference with that person's liberty." *Harper*, 494 U.S. at 221-2, 229. The Supreme Court extended this rule to pre-trial detainees like plaintiff. *See Riggins v. Nevada*, 504 U.S. 127, 135 (1992) ( "Under *Harper*, forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness. The Fourteenth Amendment affords at least as much protection to persons the State detains for trial."). *See also, Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 650, 662-63, 686 (7th Cir. 2012) (court held that a pre-trial detainee who died of psychogenic polydipsia [a disorder characterized by excessive thirst and compulsive water drinking] had "a constitutional right, provided he did not pose a danger to himself or others, to refuse the very medication that might have mitigated the symptoms of his schizophrenia and lessened the odds of his experiencing psychogenic polydipsia"); *Noble v. Schmitt*, 87 F.3d 157, 161 (6th Cir. 1996) ("[t]he Supreme Court has held that individuals in state custody enjoy protectable liberty interests to be free from bodily restraint, and to refuse medical treatment such as the administration of antipsychotic drugs").

However, a detainee's right to refuse treatment is not absolute. While an inmate or detainee has a due process right to refuse medication, the due process clause also permits the state to treat an inmate with antipsychotic drugs against his will, "to reduce the danger that an inmate suffering from a serious mental disorder represents to himself or others." *Harper*, 494 U.S. at 236. In the case of a mental patient, the Supreme Court has recognized that while the patient enjoys profound liberty interests, "[w]here an inmate's mental disability is the root cause of the threat he poses to the inmate population, the State's interest in decreasing the danger to others necessarily encompasses an interest in providing him with medical treatment for his illness." *Noble*, 87 F.3d

at 162, quoting *Harper*, 494 U.S. at 225-26. "Thus, the state may administer involuntary medical treatment to an institutionalized mental patient if that patient poses a threat to himself or other patients, or if treatment is in that patient's medical interest." *Id.*, quoting *Harper* at 494 U.S. at 227. Because "the risks associated with antipsychotic drugs are for the most part medical ones, best assessed by medical professionals," the inmate's due process does not require a judicial hearing, but may be served by an administrative review using medical decisionmakers. *Harper*, 494 U.S. at 233.

Factual questions exist as to whether Muskegon County's alleged policies, customs or practices at the Jail addressed the issue raised in *Harper*. Neither of the psychiatrists who examined plaintiff found that he posed a danger to himself or to others as to require involuntary hospitalization. However, their evaluations did not specifically address whether plaintiff posed a danger to himself or others for purposes of involuntary medication as allowed in *Harper*. Based on this record, it appears that Muskegon County had no mechanism in place to forcibly medicate an inmate or detainee as allowed in Harper.

The record reflects that defendants pulled plaintiff's medication and maintained the status quo until plaintiff was evaluated during the court-ordered competency hearing.[7] Plaintiff's

---

[7] In Michigan, competency determinations are made pursuant to M.C.L. § 330.2020, which provides as follows:

(1) A defendant to a criminal charge shall be presumed competent to stand trial. He shall be determined incompetent to stand trial only if he is incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner. The court shall determine the capacity of a defendant to assist in his defense by his ability to perform the tasks reasonably necessary for him to perform in the preparation of his defense and during his trial.

(2) A defendant shall not be determined incompetent to stand trial because psychotropic drugs or other medication have been or are being administered under proper medical direction, and even though without such medication the defendant might be incompetent to stand trial. However, when the defendant is receiving such medication, the court may, prior to making its determination on the issue of incompetence to stand trial, require the filing of

right to refuse medication to treat his mental illness is similar – but not identical to – plaintiff's right to refuse medication to render him competent to stand trial. In *Sell v. United States*, 539 U.S. 166 (2003), the Supreme Court "concluded that the Constitution permits the [g]overnment, in limited circumstances, to involuntarily administer anti-psychotic drugs to a mentally ill criminal defendant, in order to render the defendant competent to stand trial for serious but nonviolent crimes." *United States v. Stephenson*, No. 1:10-cr-206, 2011 WL 3738967 at *6 (W.D. Mich. Aug. 23, 2011). Under the test set forth in *Sell*, antipsychotic drugs may be involuntarily administered to a mentally ill criminal defendant in order to render him competent to stand trial only if four factors are present: (1) "*important* governmental interests are at stake"; (2) involuntary medication will " *significantly further* " the concomitant state interests of a timely prosecution and a fair trial; (3) "involuntary medication is *necessary* to further those interests"; and (4) "administration of the drugs is *medically appropriate, i.e.*, in the patient's best medical interest in light of his medical condition " *Sell*, 539 U.S. at 180-81 (emphasis in original).

In reaching this determination, the Supreme Court noted that the forced medication related to a defendant's competency to stand trial presents a different issue from the forced medication of an inmate or detainee who places his own health at risk by refusing medical treatment:

> We emphasize that the court applying these standards is seeking to determine whether involuntary administration of drugs is necessary significantly to further a particular governmental interest, namely, the interest in rendering the defendant *competent to stand trial*. A court need not consider whether to allow forced

---

a statement by the treating physician that such medication will not adversely affect the defendant's understanding of the proceedings or his ability to assist in his defense.

M.C.L. § 330.2020. *See People v. Snyder*, 108 Mich. App. 754, 757, 310 N.W.2d 868 (1981) ("[a] determination [under M.C.L. § 330.2020] that a defendant is competent to stand trial is a finding that, at the time that the issue is presented, the accused understands the nature and object of the proceedings against him and that he is capable of assisting his defense in a rational manner").

medication for that kind of purpose, if forced medication is warranted for a *different* purpose, such as the purposes set out in *Harper* related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk. 494 U.S., at 225–226, 110 S.Ct. 1028. There are often strong reasons for a court to determine whether forced administration of drugs can be justified on these alternative grounds *before* turning to the trial competence question.

For one thing, the inquiry into whether medication is permissible, say, to render an individual nondangerous is usually more "objective and manageable" than the inquiry into whether medication is permissible to render a defendant competent. [*Riggins v. Nevada*, 504 U.S. 127, 140 ] (KENNEDY, J., concurring in judgment). The medical experts may find it easier to provide an informed opinion about whether, given the risk of side effects, particular drugs are medically appropriate and necessary to control a patient's potentially dangerous behavior (or to avoid serious harm to the patient himself) than to try to balance harms and benefits related to the more quintessentially legal questions of trial fairness and competence.

For another thing, courts typically address involuntary medical treatment as a civil matter, and justify it on these alternative, *Harper*-type grounds. Every State provides avenues through which, for example, a doctor or institution can seek appointment of a guardian with the power to make a decision authorizing medication — when in the best interests of a patient who lacks the mental competence to make such a decision. . .

*Sell*, 539 U.S. at 181-82. The Supreme Court's opinions draw distinctions between a detainee who requires treatment under *Harper*, and a detainee who requires forced medication to become competent to stand trial under *Sell*. In this case, plaintiff has presented evidence that Muskegon County failed to have a mechanism in place to treat his mental illness at the Jail as envisioned in *Harper*. In addition, there is also evidence that the County relied on the state court competency proceeding as a substitute for providing treatment of plaintiff at the Jail.

Given this record, genuine issues of material fact exist with respect to: (1) identifying the Jail's policies, customs or practices which apply to mentally ill inmates or detainees; (2) whether those policies, customs or practices caused plaintiff's alleged injuries; and (3) whether a direct causal link existed between those policies, customs or practices and plaintiff's alleged denial

of adequate medical care. *Jones*, 625 F. 3d at 946. Accordingly, Muskegon County's motion for summary judgment (docket no. 198) should be denied with respect to plaintiff's deliberate indifference claim arising from inadequate medical care.

### 2. Deliberate indifference (failure to train)

Plaintiff did not allege a separate count for the County's failure to train its employees. However, he raised the issue in ¶ 70 of his amended complaint which stated:

> If Mr. Carl's lack of treatment was not the result of the official custom practice, and policy of the jail, it was due to an utter failure of Sheriff Roesler to properly train his jail command, including jail administrator and sergeants, and jail staff on how to respond when detainees and inmates require urgent psychiatric treatment.

Amend. Compl. at ¶ 70. While the alleged failure to train was not pled as a separate count, defendants addressed this theory as part of plaintiff's § 1983 action. *See* Sheriff Roesler's Brief at pp. 11-13.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, – U.S. –, 131 S. Ct. 1350, 1359 (2011). To establish a failure to train claim against Muskegon County, plaintiff must prove three elements: (1) that a training program is inadequate to the tasks that the County employees must perform; (2) that the inadequacy is the result of the County's deliberate indifference; and (3) that the inadequacy is closely related to or actually caused plaintiff's injury. *Plinton v. County of Summit*, 540 F.3d 459, 464 (6th Cir. 2008).

> A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train. Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action — the deliberate indifference — necessary to trigger municipal liability. Without notice that a course

of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick*, 131 S. Ct. at 1359-60 (citations and internal quotation marks omitted).

Plaintiff set forth the following facts in support of this claim:

185.    Lt. Burns agrees that it is part of his job to recognize when an inmate may be suffering from a mental illness.  Exhibit 4, Burns Deposition, page 25.  However, he does not know if he has any education regarding recognizing inmates with mental illness, and he has no such training.  Exhibit 4, Burns Deposition, pages 26-27; Exhibit 92, County Defendants' Supplemental Response to Request for Admission No. 5.  When asked in his deposition if he himself makes any decisions regarding mental health services at the jail, he said that he makes the decision to request services.  Exhibit 4, Burns Deposition, page 24.

186.    All of the County defendants (i.e., all defendants except Katherine Jawor) admit that the jail command and staff that dealt with Mr. Carl at any time between February 23, 2008 and April 18, 2008 did not have any training in recognizing, evaluating, or treating mental illness.  Exhibit 92, Muskegon County Defendants' Supplemental Response to Plaintiff's Request for Admission 5. This is despite the fact that Lt. Burns agrees that it is essential that personnel at the jail be properly trained in how to deal with inmates or detainees potentially suffering from mental illness.  Exhibit 4, Burns Deposition, page 196.

187.    The need for training was obvious to the County.  Sheriff Roesler testified that although he does not know a specific percentage of inmates and detainees at the jail who suffer from a serious mental illness, Exhibit 5, Roesler Deposition, page 127, he has reviewed this topic on occasion, including in 2008 or before.  Exhibit 5, Roesler Deposition, page 128.  Nurse Bowen said that in 2006 or 2007, she read a study done by the jail that the jail administrator at the time (Lt. Kubicek, Lt. Burns' predecessor) authored.  Nurse Bowen stated that this study showed that 15-18% of the population in the jail suffered from mental illness, "and if you wanted to include anxiety and depression, it [the reported percentage] was much higher."  Exhibit 3, Bowen Deposition, page 140-141.  Nurse Yonker testified that, based on his knowledge of psychiatric medications being distributed in the jail in 2008, the percentage of inmates and detainees receiving medication for mental illness was roughly 20-25%.    Exhibit 18, Yonker Deposition, page 129.  Furthermore, the National Commission on Correctional Health Care (NCCHC's) Standards for Health Services in Jails, which as noted above was in the possession of the jail, cites a United States General Accounting Office projection that anywhere between 6-14% of the incarcerated population may have a major psychiatric disorder. 12 Exhibit 84, page MC 2031.13

Plaintiff's Appx. at ¶¶ 185-87 (footnotes omitted).

Plaintiff has presented evidence that a number of mentally ill individuals are held at the Jail, but that the Jail employees have not received training to recognize, evaluate, or treat mental illness.[8] Assuming that this is true, plaintiff's claim fails because he has not shown that Muskegon County had " actual or constructive notice" that a particular omission in their training program caused the Jail staff to violate plaintiff's constitutional rights. *See Connick*, 131 S.Ct. at 1360. Specifically, plaintiff has presented no evidence that the County experienced a pattern of "similar constitutional violations by untrained employees" at the Jail. *Id.* at 1360. In the absence of such notice, it cannot be said that Muskegon County acted with deliberate indifference by establishing "a training program that will cause violations of constitutional rights." *Id.* Accordingly, Muskegon County's motion for summary judgment (docket no. 198) should be granted with respect to plaintiff's deliberate indifference claim arising from the failure to train employees.

## C.      Sheriff Roesler and Lt. Burns

It is well settled that a § 1983 action cannot be based on a theory of respondeat superior. *See Monell*, 436 U.S. at 691; *Taylor v. Michigan Department of Corrections*, 69 F.3d 76, 80-81 (6th Cir. 1995). A supervisor's liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act. *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998). In order to hold a supervisor liable under § 1983, "[t]here must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). To demonstrate

---

[8] The court notes that Nurse Bowen considered herself qualified to evaluate the signs of mental illness. *See* discussion in § III.E., *infra*.

deliberate indifference of a government official, the inmate (in this case the detainee) must present evidence from which a trier of fact could conclude that the official was subjectively aware of the risk and disregarded it by failing to take reasonable measures to abate it. *See Farmer*, 511 U.S. at 829, 847; *Greene v. Bowles,* 361 F.3d 290, 294 (6th Cir. 2004). However, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. "At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy*, 729 F.2d at 421.

### 1. Sheriff Roesler

### a. Deliberate indifference (individual capacity)

As an initial matter, defendant Roesler was not the Muskegon County Sheriff until April 1, 2008. Sheriff Roesler Dep. at p. 6 (docket no. 188-2). Prior to that time, Roesler was the Muskegon County Undersheriff. *Id.* The reporting officer's narrative of plaintiff's arrest on February 26, 2008 indicates that Undersheriff Roesler had some knowledge of plaintiff's mental problems:

> We were advised by Undersheriff Roesler that a male subject (Timothy Carl) at that location had just had a felony warrant issued for him by the Prosecutors Office. Due to Carl's mental problems it was advised to pick him up ASAP on the warrant . . .

Reporting Officer's Narrative (docket no. 235-4 at p. 4). Plaintiff also cites a February 27, 2008 article from *The Muskegon Chronicle*, in which then Undersheriff Roesler described plaintiff as follows:

He has a bad attitude and doesn't want to do what he's told. He doesn't want to follow directions and because of his size (6-6 and 220 pounds), it takes a couple of deputies to move him from point A to point B."

"*$300,000 bond set for man facing abuse charges,*" The Muskegon Chronicle (Feb. 27, 2008) (docket no. 235-2).

Undersheriff Roesler also received a copy of a letter dated March 21, 2008, from Donald L. Mathews (plaintiff's pastor) to Tony Tague (Muskegon County Prosecutor) which referenced plaintiff's competency examination. *See* Mathews Letter (March 21, 2008) (docket no. 188-3). The letter states in pertinent part as follows:

Dear Tony:

I was pleased to note in a recent Chronicle article that Tim Carl has been recommended for a mental health exam!

I have known Tim, his parents and his deceased older brother for some time. The recommendation for a mental health exam seemed a wise and welcome move to me.

My hope would be that he will not be so highly medicated to achieve "quietness" in the jail when the examination takes place that he will not be able to take such an exam authentically.

I will copy this to Dean Roesler to note this concern.

Matthews Letter (March 21, 2008). Undersheriff Roesler made the following notation on the letter, "<u>Medical</u> make sure this guy can be appropriately examined. DR." *Id.* (emphasis in original).

While Roesler had some knowledge aware of plaintiff's condition, there is no evidence that he was involved in plaintiff's day to day medical care while at the jail. To the extent that Roesler was aware of plaintiff's situation in March 2008, his limited involvement consisted of writing a note to the medical department at the jail directing them to perform an adequate evaluation of plaintiff. Such action does not meet the subjective prong of a deliberate indifference claim.

Accordingly, Sheriff Roesler's motion for summary judgment (docket no. 186) should be granted as to the claim that Roesler, in his individual capacity, was deliberately indifferent to plaintiff's serious medical needs.

### b.    Deliberate indifference (Official Capacity)

The court reaches a different result with respect to plaintiff's claim against Sheriff Roesler in his official capacity.  An official capacity suit represents another way of pleading an action against an entity of which an officer is an agent.  *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).  "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166.  Under Michigan law, a county sheriff is a constitutional officer, Mich. Const. 1963, art. 7, § 4, who has the "charge and custody of the jails of his county, and of the prisoners in the same," M.C.L. § 51.75.  There is no dispute that under state law, a Michigan Sheriff has "final policy making authority" over the county's jail or correctional facility.  *See Miller*, 408 F.3d at 814. Given this status, Sheriff Roesler, in his official capacity, would be responsible for setting policy at the Jail. The court has previously concluded that genuine issues of material fact exist with respect to the Jail's policies, customs and practices which relate to the treatment of mentally ill inmates, and whether any of the policies, customs and practices amount to deliberate indifference to plaintiff's medical needs.  *See* discussion in § III.B.1, *supra*.  Accordingly, Sheriff Roesler's motion for summary judgment (docket no. 186) should be denied as to the claim that Roesler, in his official capacity, was deliberately indifferent to plaintiff's serious medical needs.

### c. Failure to train (Official capacity)

Plaintiff has not alleged a separate count directed at Sheriff Roesler for his failure to train the Jail employees with respect to treatment of mentally ill inmates or detainees. However, to the extent that plaintiffs complaint can be construed to allege such a violation, such a claim would be against the Sheriff in his official capacity. Because such a claim would actually be against Muskegon County, Sheriff Roesler, like the County, is entitled to summary judgment on this claim. *See* discussion in § III.B.2., *supra*. Accordingly, Sheriff Roesler's motion for summary judgment (docket no. 186) should be granted as to the claim that Roesler, in his official capacity, failed to train Jail employees.

### 2. Lt. Burns

### a. Deliberate indifference

Lt. Burns testified that he is the Jail Administrator and supervisor of the Jail's medical department. Burns Dep. at p. 13 (docket no. 196-3). In this position, Lt. Burns meets with the medical department on a regular basis, and has the authority to send an inmate for evaluation for hospital admission in conjunction with the nursing staff, the jail physician and CMH. *Id.* at p. 15. While part of his job is to identify inmates with mental health problems, he does not do mental health evaluations or treatment, other than overseeing the officers who provide the inmates and detainees' medications. *Id.* at p. 25. Lt. Burns was not present at the jail from March 2 to March 6, 2008. Roesler Dep. at pp. 170-71 (docket no. 196-4).

On March 9, 2008, Lt. Burns transferred plaintiff from a holding cell to a security cell (which is considered part of the general population of the Jail). *Id.* at p. 64. Lt. Burns stated that he made this transfer "probably" as a matter of comfort, because the holding cells "are kind of cold

and cementy" with "not much other human contact." *Id.* In addition, because there are limited spaces in the holding cell, jail personnel try to circulate the inmates from holding into general population. *Id.*

Plaintiff points out that Lt. Burns released him contrary to Mr. Weinert's March 7, 2008 recommendation that plaintiff remain in the holding cell until a re-evaluation on March 10, 2008. *See* Plaintiff's Appx. at ¶ 112. Plaintiff also points to the testimony of Nurse Bowen and Sgt. Jones-Burton that CMH must "clear" an inmate or detainee before that person is moved from a holding cell to the general population. Sgt. Jones Burton testified that:

> . . . [I]f they are in temporary holding under observation, CMH has to clear them. They have to be seen and cleared by CMH. If a person is suicidal, then they would have to be seen by CMH before they would go to general population. If a person just has a medical problem – they have high blood pressure – then they would have to be seen and cleared by medical staff before going to general population.

Jones-Burton Dep. at p. 182 (docket no. 231-5). With respect to plaintiff, Nurse Bowen testified that:

> There should have been another evaluation on Monday [March 10, 2008] because Mr. Carl was kept down in holding and would not be able to go until somebody from CMH cleared him, so he would be down in a holding cell until Community Mental Health evaluated him.

Bowen Dep. at p. 90 (docket no. 228-4).

On March 18, 2008, plaintiff refused his medication and during lunch engaged in aggressive behavior (slamming the telephone, cussing, and hitting the wall). Inmate Log Notes (docket no. 196-5). As a result of this behavior, Lt. Burns withheld his 1:00 p.m. visit. *Id.* That same day, a deputy attempted to give plaintiff his medications, but plaintiff refused, became agitated, clenched his fists and swore at the deputy. Inmate Log Notes (docket no. 196-6). The deputy locked plaintiff down. *Id.* The Inmate Log Notes include the following statement:

28

> Per Lt. Burns Carl should be locked down until he begins taking his medications.
> Carl will be going for a psych evaluation on 3/27/2008.

*Id.* At his deposition, Lt. Burns explained that plaintiff was locked down on that date because he misbehaved and acted out. Lt. Burns Dep. at p. 94 (docket no. 196-3 at p. 8). Lt. Burns denied that plaintiff was locked down for refusing to take his medication. *Id.*

Plaintiff's medication was "pulled" on that date. Nurse Bowen explained that pulling the medication meant that medication was taken off of the Jail floor and returned to the medical department until CMH evaluated the situation. Nurse Bowen Dep. at pp. 48, 51 (docket no. 197-1). According to Nurse Bowen, pulling the medication was not permanent; rather, the medication was taken off of the Jail floor and placed at another location at the Jail. *Id.* at p. 51. As Nurse Bowen explained:

> It's a practice after they refuse three or more consecutive days, and with [plaintiff] I believe we tried longer, then the medications are taken off of the floor. Because [plaintiff] would, from what I heard, get angry when he was offered the medications, so rather than have the deputies continually ask him and have him, you know, be angry, then they are brought down to our office, and then to have CMH reevaluate him.

*Id.* at p. 51. In this regard, Nurse Bowen testified that "[w]e cannot force somebody to take medication, competent or incompetent, without a court order." *Id.* at p. 65. Despite having "pulled" the medications from the Jail floor, staff attempted to have plaintiff take his medications on March 24, 28 and 30, 2008. Inmate Log Notes (docket no. 197-2); Medical Progress Notes (docket no. 197-3).

In explaining his actions, Lt. Burns asserts that plaintiff was a legally competent adult who had a constitutional right to refuse his to take antipsychotic drugs unless he was considered a danger to himself or others. *See Harper*, 494 U.S. 210. Defendants contend that absent a

determination that plaintiff was incompetent or found to be a danger to himself or others, the Jail staff was legally bound to honor plaintiff's refusal to take his medication.

Plaintiff has met the objective prong of a deliberate indifference claim by demonstrating that his mental illness was a serious medical need. The issue before the court is whether plaintiff has demonstrated that Lt. Burns met the subjective prong of a deliberate indifference claim. Viewing the evidence in the light most favorable to the non-moving party, the court concludes that Lt. Burns was not deliberately indifferent to plaintiff's serious medical needs with respect to providing him with medication, but was deliberately indifferent to plaintiff's serious medical needs when he released plaintiff into the general population before CMH "cleared" plaintiff for release.

"[P]rison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). A plaintiff can show deliberate indifference when prison guards intentionally deny or delay access to medical care or intentionally interfere with the treatment once prescribed. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Cook v. Martin*, 148 Fed. Appx. 327, 336 (6th Cir. 2005).

It is undisputed that plaintiff refused to take his medication on various occasions. There was no determination from a mental health professional that plaintiff was not competent to handle his affairs until Judge Nolan obtained the CFP evaluation and issued his order on April 11, 2008. Finding and Order on Competency (April 11, 2008) (docket no. 245-3). Judge Nolan's order finding that plaintiff was incompetent to stand trial did not authorize the Jail staff to forcibly medicate plaintiff. Lt. Burns had to respect plaintiff's constitutional right to refuse medication until

such time as he was deemed to be a danger to himself or others. *See Harper*, 494 U.S. at 221-22. Lt. Burns did not consciously disregard a risk of harm to plaintiff. Rather, he complied with the recommendations of the Jail's medical department decision to pull plaintiff's medication. While Lt. Burns had the authority to send an inmate for evaluation for hospital admission in conjunction with the nursing staff, the jail physician and CMH, the record reflects that two different psychiatrists from CMH evaluated plaintiff and declined to certify him for hospitalization. Under these circumstances, Lt. Burns was not deliberately indifferent to plaintiff's serious medical with respect to pulling plaintiff's medication.

However, the same cannot be said for Lt. Burns decision to release plaintiff into the general population on March 10, 2008. Two Jail employees testified that an inmate or detainee with mental problems cannot be released from the holding cell until CMH evaluates the inmate or detainee and "clears" him for release into the general population. Here, plaintiff has presented evidence that Lt. Burns released plaintiff into the general population before CMH (in this case, Mr. Weinert) had an opportunity to re-evaluate plaintiff. Under these circumstances, Lt. Burns intentionally interfered with plaintiff's course of treatment. *See Estelle*, 429 U.S. at 104; *Cook*, 148 Fed. Appx. at 336. Lt. Burns' motion for summary judgment (docket no. 194) should be granted with respect to all claims except the claim that Burns released plaintiff into the general population before CMH cleared plaintiff for release.[9]

---

[9] Lt. Burns' brief includes a conclusory argument claiming qualified immunity. However, he cites no law in support of this claim. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). Accordingly, Lt. Burns' claim for qualified immunity is deemed waived.

### D. The command sergeants

#### 1. Sgt. Bonstell

Defendant Sgt. Bonstell testified he had no training in evaluating, treating or medicating mental illness. Bonstell Dep. at p. 13 (docket no. 167-2). Bonstell explained that if an inmate needed an evaluation for hospitalization for a mental health issue, then the Jail's medical department would communicate that to the command officer on duty and arrangements would be made for the evaluation. *Id.* at pp. 20-21. It is not the role of the command sergeant to second guess the Jail's medical staff regarding treatment or hospitalization of an inmate or detainee. *Id.* at pp. 20-21, 43. If an inmate is refusing medication this information would be communicated by the deputies to the medical department in either a written report or verbally. *Id.* at p. 33. Sgt. Bonstell was not aware of any unusual behavior by plaintiff. *Id.* at p. 43. In his brief, Sgt. Bonstell admits that there was no doubt, based on the CMH evaluations, that plaintiff had a mental illness and that "[t]here was some degree of uncertainty among the staff how serious his mental illness was, and whether it posed any danger to his health." Bonstell Brief at p. 10 (docket no. 166).

#### 2. Sgt. Gilchrist

Sgt. Gilchrist testified as follows. Any recommendation for inmate hospitalization or evaluation would come from a nurse at the jail's medical department. Gilchrist Dep. at p. 23(docket no. 192-3). His role would be to assist in making arrangements for transporting the inmate. *Id.* Gilchrist deferred to the recommendations of the medical staff because he is "not an expert in that area." *Id.* at p. 24. He received training to distinguish between different types of "bizarre behavior" by inmates, i.e., "to help recognize the difference between a person that could potentially be under the influence of drugs or alcohol and mental issues." *Id.* at p. 25. Sgt. Gilchrist

recalled that plaintiff exhibited bizarre behavior while at the jail, such as ranting and talking nonsensically. *Id.* at p. 55. While there is no policy at the jail regarding the observation of such bizarre behavior, the practice at the jail is as follows: if a correctional officer observes bizarre behavior, then it is communicated to a command sergeant (such as Gilchrist) so that a report can be written and forwarded to the medical department. *Id.* at p. 56. While he frequently writes reports on personal observations of inmate bizarre behavior, Gilchrist did not write any reports with respect to plaintiff's bizarre behavior. *Id.* at pp. 56-58. Gilchrist explained:

> Because I know that he was taking medications for mental health-related issues, the medical department was aware that he had mental health-related issues, and I do know that, based on that, that he has been in our medical department and Community Mental Health had been coordinating his treatment for the steps that they were taking with dealing with his mental illness.

*Id.* at p. 58.

### 3.    Sgt. Jones-Burton

Sgt. Jones-Burton testified as follows. Her job duties as a command sergeant at the Jail did not involve recognizing when a detainee is suffering from mental illness, evaluating a detainee who is suffering from mental illness, or medicating such a detainee. Jones-Burton Dep. at pp. 8, 22 (docket no. 182-2). Medications at the jail are distributed by the corrections officers. *Id.* at p. 23. When a detainee at the jail refuses medications, the standard practice is to bring it to the attention of the nurse to see if there is a reason for the refusal or "to at least make [the nurse] aware that they are refusing it." *Id.* at p. 22. There are a variety of reasons for refusing medication: it makes the detainee sick; the detainee may need food with it; it is the wrong medication; or it is different medication from that previously used. *Id.* Under any of these circumstances, Sgt. Jones-Burton would bring the situation to the attention of the nurse. *Id.*

33

Sgt. Jones-Burton testified that she was not aware of any policy regarding when an inmate may need to be hospitalized. *Id.* at p. 24. Her practice would be that "the nurse would come to me and say that this person needs to go on to the hospital for this reason or that reason, and so I would have someone take them to the hospital." *Id.* While Jones-Burton recalled speaking to the nursing staff about plaintiff not taking his medications, she could not recall any specific incidents. *Id.* at p. 35. With respect to the use of the pepperball launcher, Jones-Burton testified that it was used in this case because plaintiff was not following a direct order, would not go back to his cell, and she wanted to avoid physically forcing plaintiff back into his cell. *Id.* at p. 86.

**4.    Discussion**

Assuming that the three defendant command sergeants, Gilchrist, Burton-Jones and Bonstell, were aware of plaintiff's condition, their failure to seek additional treatment or to hospitalize plaintiff did not amount to deliberate indifference. The common thread among the three defendant command sergeants was their reliance upon the Jail's medical staff for evaluating and treating plaintiff's medical needs. Their role was to implement the decisions made by the Jail's medical staff and report when an inmate or detainee acted bizarre or failed to take prescribed medication. As Sgt. Gilchrist pointed out, bizarre behavior was not uncommon in the Jail. These defendants knew that plaintiff was being treated by the medical department and that plaintiff had a history of refusing medication.

Given this record, plaintiff has not established that these three defendants met the subjective prong of his deliberate indifference claim. This is not a situation in which the command sergeants consciously disregarded a risk to plaintiff's health by failing to recognize an obvious medical problem which could cause the death or serious injury. *See, e.g.*, *Phillips v. Roane County,*

*Tennessee*, 534 F.3d 531, 540-41 (6th Cir. 2008) (correctional officers found to have culpable state of mind where they did not transport the detainee to a hospital emergency room for diagnosis, despite the fact that detainee was found unconscious on November 24th, complained of serious symptoms including chest pains, vomiting, nausea and constipation for about two weeks, and eventually died of untreated diabetes on December 8th). Nor is this a situation in which the sergeants were deliberately indifferent by "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted). Rather, these sergeants deferred to the decisions made by the Jail's medical staff regarding plaintiff's treatment and noted when plaintiff refused medication or engaged in bizarre behavior. Accordingly, the motions for summary judgment filed by defendants Bonstell (docket no. 165), Gilchrist (docket no. 190), and Burton-Jones (docket no. 180) should be granted as to plaintiff's deliberate indifference claim.

### E.    Nurse Bowen

The gist of plaintiff's claim against Nurse Bowen is that she "made the decision, without the permission of the prescribing authority, to 'pull' [plaintiff's] anti-psychotic medication after he refused them several times, even though she knew that [plaintiff] was severely mentally ill and psychotic." Plaintiff's Reply at p. 12 (docket no. 227). Then, "[a]fter she withdrew his medications, she did not inform the prescribing authority and failed to contact the jail doctor or any mental health professional to help [plaintiff]." *Id.*

As a registered nurse, she is authorized to give medications, evaluate inmates and assess for side effects. Bowen Dep. at p. 30. She cannot diagnose conditions, but she can talk to inmates and observe obvious signs, such as whether an inmate is depressed or anxious. *Id.* at p. 31.

35

If an inmate or detainee engages in unusual action, e.g., speaking incoherently, hearing voices or hallucinating, the Jail's medical department contacts CMH to evaluate the person and to determine whether he is faking a condition or if that condition is real. *Id.* at pp. 30-31. Nurse Bowen testified that she did not diagnose plaintiff, evaluate the appropriateness of his treatment, or "second-guess any treatment recommendations" made for him. *Id.* at p. 32.

Nurse Bowen testified that on average two to three inmates per week will refuse their medications for various reasons (such as the cost of the medication or side effects). *Id.* at p. 45. After three refusals, the medications are "pulled" (taken off of the floor), at which time the medical department notifies the command sergeant, the lieutenant and CMH. *Id.* at pp. 45, 48. While medications remain "pulled" until CMH evaluates the inmate or detainee, it was the Jail's practice to continue to offer residents "pulled" medications. *Id.* at p. 48.

With respect to the issue of forced medication, Nurse Bowen testified that "[w]e cannot force somebody to take medication, competent or incompetent, without a court order." *Id.* at p. 65. When asked if the Jail had a "policy" that anyone could refuse their medication, Nurse Bowen responded that it was a "common practice" as opposed to a policy. *Id.* If the inmate or detainee's refusal was going to cause great bodily harm, such as refusing insulin or dialysis, then the Jail staff requested that individual to sign a form acknowledging the risks of refusing treatment. *Id.* With respect to mentally ill inmates or detainees, the Jail staff uses a different approach, because these individuals are referred to CMH and there are different types of treatment options, e.g., hospitalization, obtaining a court order, and using injectable medication. *Id.* Nurse Bowen assumed that plaintiff was a client of CMH based upon his medications, his actions, the circumstances which led to his confinement and a phone conversation with his mother. *Id.* at p. 110. Nurse Bowen did

not recall whether plaintiff's family provided the jail with samples of his medication, but she did order medications for him. *Id.*

Plaintiff points out the following facts which he believes support a claim of deliberate indifference against Nurse Bowen. Nurse Bowen saw plaintiff at the Jail on February 26, 2008. She charted in the Medical Progress Sheet that day, noting that plaintiff did not understand what he did wrong to result in him being in jail, that he was considered dangerous and should remain alone. Medical Progress Sheet (docket no. 235-5); Christy Bowen Dep. at pp. 155, 254, 276 (docket no. 228-4). Nurse Bowen and the other nurses in the medical department did not schedule plaintiff to see the Jail physician, Dr. Deitrick "because he was going to see the physician at CMH." Bowen Dep. at p. 235. In response to a request for admission, the Muskegon County defendants admitted that Dr. Deitrick never met, saw, or evaluated plaintiff and that the doctor was not asked by any of those defendants "to ever meet with, see, or evaluate" plaintiff. *See* Order (docket no. 160).

Nurse Bowen's March 18, 2008 entry in plaintiff's Medical Progress Sheet indicates that she made a phone call to "Steve" at CMH relating to plaintiff's refusal to take medications. Medical Progress Sheet (docket no. 235-5). Although claiming that he did not recall anyone ever telling him that plaintiff was refusing medications or meals, Mr. Weinert admitted that there is not another "Steve" at CMH department. Steve Weinert Dep. at pp. 100, 142. On March 18, 2008, Nurse Bowen noted that plaintiff's medications were "pulled off floor." Medical Progress Sheet (docket no. 235-5). Nurse Bowen testified that the decision to pull medications off the floor is authorized by the Jail command or the Jail Lieutenant. Nurse Bowen Dep. at p. 179 (docket no. 228-4).

When plaintiff indicated he would take his medication on March 24, 2008 – and then refused to take them when offered – Nurse Bowen documented her response: "I pulled the meds again along with the [medication] cards." Inmate Log (docket no. 236-3). Nurse Bowen noted on March 24, 2008 that "meds pulled inmate playing games . . . (Put in mouth & spit into cup)." Medical Progress Sheet (docket no. 235-5). It is undisputed that "after the March 24, 2008 incident, [plaintiff] was given no further medication." Answer at ¶ 47 (docket no. 3).

Nurse Bowen testified that it was her practice to inform the command officer, the lieutenant and CMH that medications were pulled off the floor. Bowen Dep. at p. 61 (docket no. 228-4). Bowen testified that she notified CMH, Mr. Weinert and Lt. Burns about plaintiff's refusal to take medications. Bowen Dep. at pp. 108, 115-18 (docket no. 228-4). Nurse Bowen agreed it would have been important for someone from the jail to inform CMH that plaintiff's medications had been removed from the floor. *Id.* at p. 59. However, she does not remember calling CMH or talking to Steve Weinert to relay this particular information. *Id.*

While Nurse Bowen could not recall whether she informed CMH of her decision to remove plaintiff's medications from the floor, Mr. Weinert testified that he had no recollection of that decision. Weinert Dep. at p. 146 (docket no. 229-4). Mr. Weinert further testified:

> [I]f it happened, there's no way I would tolerate that at all. When someone is prescribed medication, they're prescribed medication.

*Id.* [10] Another nurse at the Jail, Sherry Malenko, testified that the decision to "pull" an inmate's medications can only be made by the Jail's medical department with the approval of the Jail's physician. Sherry Malenko Dep. at p. 56 (docket no. 230-1).

Plaintiff has met the objective prong to prove a deliberate indifference claim. To meet the subjective prong, plaintiff must show that Nurse Bowen had a sufficiently culpable state of mind in denying medical care, i.e., that she subjectively knew of a risk to plaintiff's health, drew the inference that a substantial risk of harm to plaintiff existed, and consciously disregarded that risk. *Jones*, 625 F.3d at 941. In reviewing deliberate indifference claims, "nurses are held to a higher level of responsibility to recognize medical needs and risks because of their training." *Stefan v. Olson*, No. 11-3775, 2012 WL 3799211 at *7 (6th Cir. Aug. 31, 2012), citing *Dominguez v. Correctional Medical Services*, 555 F.3d 543, 550 (6th Cir. 2009). Here, genuine issues of material fact exist with respect to whether Nurse Bowen was authorized to pull plaintiff's medications. Under the circumstances of this case, when Nurse Bowen pulled plaintiff's medication without contacting CMH or the Jail physician, the failure to offer plaintiff his prescribed medication resulted in a total lack of treatment by the Jail's medical staff. Nurse Bowen's failure to provide any treatment would be sufficient meet the subjective requirement of a deliberate indifference claim.

---

[10] The court notes that plaintiff has attributed certain statements to Mr. Weinert's supervisor at CMH, Pamela Beane as follows:

> When she "pulled" Mr. Carl's medications at the jail, Exhibit 39, page MCJ 47, Nurse Bowen was "acting out of her scope [and] against medical advice", as stated by Mr. Weinert's supervisor, Pamela Beane. Exhibit 83, page 13. See also Exhibit 20, Beane Deposition, page 148 (authenticating exhibit).

Plaintiff's Appx. at ¶ 145. However, these statements are not supported by the authorities cited by plaintiff. Exhibit 83, p. 13 consists of a copy of plaintiff's complaint with handwritten notes. The alleged deposition testimony authenticating the handwritten notes as those of Pamela Beane (Appx. Exhibit 20, p. 148) does not appear in the court record.

Where a prisoner (in this case a detainee) "is needlessly allowed to suffer pain when relief is readily available" that prisoner (or detainee) has "a cause of action against those whose deliberate indifference is the cause of his suffering." *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976). The court concludes that Nurse Bowen's motion for summary judgment (docket no. 183) should be denied as to Count 1.[11]

### F.    Mr. Weinert

Defendant Mr. Weinert has set forth the following facts in support of his motion for summary judgment.  Mr. Weinert is a limited licensed psychologist (LLP).  *See* CMH Jail Request (March  7, 2008) (docket no. 214-1); Steve Weinert Dep. at p. 68 (docket no. 229-4).  Mr. Weinert typically visits the Jail on Mondays and sees four or five inmates or detainees at that time.  Weinert Dep. at p. 42 (docket no. 213-1).  He evaluates inmates or detainees as requested by the jail staff. *Id.*

On February 27, 2008, non-party CMH PA McLaughlin wrote a prescription for plaintiff consisting of a one-month supply of samples for Seroquel, which consisted of a 600 mg increase over his usual dose. Prescription and CMH Progress Note and prescription (docket no. 212-3).  The next day, at the request of jail staff, plaintiff was seen by non-party Joseph Lihan, a limited licensed psychologist with CMH.  Joseph Lihan Dep. at pp. 6, 9-10 (docket no. 212-4).  Mr. Lihan recommended that plaintiff remain in holding, be provided his medications, and referred this matter for further evaluation with Mr. Weinert . *Id.* at pp. 9-12; CMH Consultation note (docket no. 212-5).

---

[11] Nurse Bowen's brief includes only a conclusory argument claiming qualified immunity citing no law in support of this claim.  Accordingly, Nurse Bowen's claim for qualified immunity is deemed waived. *See McPherson*, 125 F.3d at  995-96.

On March 3, 2008, PA McLaughlin and Mr. Weinert saw plaintiff for the first time. Weinert Dep. at p. 20 (docket no. 213-1); CMH Consultation Note (Weinert) (March 8, 2008) (docket no. 213-2); CMH Physician Progress Note (McLaughlin) (March 3, 2008) (docket no. 213-3). PA McLaughlin's proposed treatment plan consisted of transferring plaintiff to the Kalamazoo Psychiatric Hospital where he would undergo treatment for his psychosis. CMH Physician Progress Note (McLaughlin) (March 3, 2008) (docket no. 213-3). After their initial evaluation, Mr. Weinert and PA McLaughlin discussed plaintiff's status with Judge Nolan. Weinert Dep. at p. 26; CMH Consultation Note (Jule McLaughlin) (March 3, 2008) (docket no. 213-3). On that same day, the Judge entered an Order for Competency Examination, directing plaintiff to undergo examination by the CFP. Order for Competency Examination (March 3, 2008) (docket no. 214-2). CFP received the order on March 7, 2008. CFP First Referral (docket no. 214-3).

Mr. Weinert requested that Dr. Jawor evaluate plaintiff for hospitalization because of his concerns for plaintiff's mental health. Weinert Dep. at pp. 58-61. As a limited licensed psychologist, Mr. Weinert was not authorized to issue the clinical certificate required to hospitalize plaintiff. *See* M.C.L. §§ 330.1400(a) and 330.1425. On March 5, 2008, Dr. Katherine Jawor evaluated plaintiff to determine whether he required an involuntary commitment to a hospital. *See* Katherine Jawor Dep. at pp. 121-22 (docket no. 213-4); Katherine Jawor Progress Note (docket no. 213-5).

In *Ziegler v. Aukerman*, No. 277602, 2008 WL 4228348 (Mich. App. Sept. 16, 2008) (unpublished), the Michigan Court of Appeals addressed the procedure for an involuntary commitment to a mental hospital:

Chapter 4 of the MHC [Mental Health Code], MCL 330.1400 *et seq.*, addresses civil admission and discharge procedures relative to mental illness, and,

with respect to admissions, the chapter is divided into sections dealing with formal and informal voluntary admissions, admissions by medical certification, and admissions by petition. Pertinent to our analysis are the provisions in the MHC addressing admission by medical certification. MCL 330.1423 provides:

> A hospital designated by the department or by a community mental health services program shall hospitalize an individual presented to the hospital, pending receipt of a clinical certificate by a psychiatrist stating that the individual is a person requiring treatment, *if an application, a physician's or a licensed psychologist's clinical certificate, and an authorization by a preadmission screening unit have been executed.* [Emphasis added.]

Under MCL 330.1423, an appropriate hospital is required to hospitalize an individual if presented with an application for hospitalization, a clinical certificate executed by a physician or licensed psychologist, and an authorization by a preadmission screening unit (PSU).

First, with respect to the application for hospitalization, MCL 330.1424 provides as follows:

> (1) An application for hospitalization of an individual under [MCL 330.1423] shall contain an assertion that the individual is a person requiring treatment as defined in [MCL 330.1401], the alleged facts that are the basis for the assertion, the names and addresses, if known, of any witnesses to alleged and relevant facts, and if known the name and address of the nearest relative or guardian, or if none, a friend if known, of the individual.
>
> (2) The application may be made by any person 18 years of age or over, shall have been executed not more than 10 days prior to the filing of the application with the hospital, and shall be made under penalty of perjury.

> *            *            *

Second, with respect to the clinical certificate, which in this case was executed by Dr. Brown, MCL 330.1425 provides:

> A physician's or a licensed psychologist's clinical certificate required for hospitalization of an individual under [MCL 330.1423] shall have been executed after personal examination of the individual named in the clinical certificate, and within 72 hours

> before the time the clinical certificate is filed with the hospital. The clinical certificate may be executed by any physician or licensed psychologist, including a staff member or employee of the hospital with which the application and clinical certificate are filed.

Pursuant to MCL 330.1400(a), a "clinical certificate" is defined as "the written conclusion and statements of a physician or a licensed psychologist that an individual is a person requiring treatment, together with the information and opinions, in reasonable detail, that underlie the conclusion, on the form prescribed by the department or on a substantially similar form."

Finally, with respect to the third requirement of MCL 330.1423, i.e., authorization by a PSU, MCL 330.1400(h) defines a PSU as "a service component of a community mental health services program established under [MCL 330.1409]."

*Ziegler*, 2008 WL 4228348 at *5-*6.

For purposes of the MHC, a "person requiring treatment" is defined as:

(a)     An individual who has mental illness, and who as a result of that mental illness can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself, herself, or another individual, and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation.

(b)     An individual who has mental illness, and who as a result of that mental illness is unable to attend to those of his or her basic physical needs such as food, clothing, or shelter that must be attended to in order for the individual to avoid serious harm in the near future, and who has demonstrated that inability by failing to attend to those basic physical needs.

(c)     An individual who has mental illness, whose judgment is so impaired that he or she is unable to understand his or her need for treatment and whose continued behavior as the result of this mental illness can reasonably be expected, on the basis of competent clinical opinion, to result in significant physical harm to himself, herself, or others. This individual shall receive involuntary mental health treatment initially only under the provisions of [M.C.L. §§ 330.1434 through 330.1438].

M.C.L. § 330.1401(a), (b) and (c) (footnote omitted).

During Dr. Jawor's evaluation, plaintiff did not express any present suicidal ideation and he agreed to take his medications, Ativan and Seroquel. Katherine Jawor Progress Note (docket

43

no. 213-5). After her evaluation, Dr. Jawor declined to issue a certificate to hospitalize plaintiff, after determining that he did not meet the criteria for involuntary commitment, i.e., he did not pose a danger to himself or others. Katherine Jawor Dep. at pp. 121-22, 341-42 (docket no. 213-4); Katherine Jawor Progress Note (docket no. 213-5).

Despite Dr. Jawor's findings, Mr. Weinert believed that plaintiff did not have the capacity to consent to hospitalization at that time. Weinert Dep. at pp. 73-74. Out of a concern for plaintiff's welfare, Mr. Weinert requested Dr. Vajendra Desai, MD, a licensed psychiatrist, to evaluate plaintiff on March 7, 2008.[12] Weinert Dep. at pp. 74-77. Mr. Weinert accompanied Dr. Desai for the evaluation of plaintiff on that date. CMH Consultation Note (Mr. Weinert) (March 7, 2008) (docket no. 214-1). After his evaluation, Dr. Desai expressed the opinion that plaintiff's behavior did not meet the criteria for inpatient hospitalization. *Id.* Mr. Weinert recommended that plaintiff remain in a holding cell through the weekend "and be re-evaluated on Monday [March 10, 2008] to assure his readiness to transfer to general population." *Id.* Mr. Weinert intended to evaluate plaintiff again on March 10th to determine if he could be released into the general population. Weinert Dep. at p. 90. However, when Mr. Weinert went to the Jail on March 10th, there was no reason to re-evaluate plaintiff because the Jail staff had already released plaintiff into the general population. *Id.* at p. 97.

---

[12] Mr. Weinert explained at his deposition:

I still had wanted to see him in the hospital more because of just a treatment setting. When I see somebody with a mental illness, I feel badly for them. This isn't something that they bring on themselves. This isn't something that they want by any means, and I want to see people not only receive treatment but maybe receive treatment in a setting that's not a jail cell, and that was more of why I wanted him to get into a hospital.

Weinert Dep. at p. 67.

On March 18, 2008, CFP personnel scheduled plaintiff for a competency examination at the Kent County Jail on March 27, 2008. *Id.* Jennifer Balay, Ph.D., a licensed psychologist for the CFP, examined plaintiff on that date and sent an evaluation to Judge Nolan. Dr. Balay Evaluation (docket no. 214-4). In Dr. Balay's opinion, plaintiff's mental condition at the time of the evaluation rendered him incompetent to stand trial. *Id.* Dr. Balay also determined that "if [plaintiff] is provided appropriate treatment in a structured hospital setting, he can be restored to competency within the time period permitted by statute." *Id.* As Mr. Weinert noted in his brief, however, Dr. Balay made no finding that plaintiff posed a threat to himself or to others. *Id.*

Judge Nolan held a competency hearing on April 11, 2008, determined plaintiff was incompetent to stand trial and ordered him to be released to the CFP for treatment until such time as he was competent. Finding and Order on Competency (April 11, 2008) (docket no. 245-3). Plaintiff was transferred to the CFP on April 18, 2008. CFP Psychiatric Admission Summary (April 18, 2008) (docket no. 245-4). Mr. Weinert admits in his brief that "[n]o one from CMH had direct contact with Plaintiff from March 7, 2008 until Plaintiff's release to the CFP on April 18, 2008." Mr. Weinert Brief at p. 6.

In his response, plaintiff contends that Mr. Weinert was deliberately indifferent for failing to follow up with him at the Muskegon County Jail after March 10, 2008. In this regard, plaintiff contends that Mr. Weinert failed to follow CMH's written protocol for emergency mental health evaluations of Jail inmates and CMH's written policy regarding provision of mental health services to the Jail. Plaintiff's Appx. at ¶ 118; CMH "Protocol for Mental Health Emergency Evaluation of Jail Inmates" (docket no. 243-4 at p. 6); CMH Policies and Procedures ("Jail Mental Health Services") (docket no. 244-1 at pp. 13-14). Plaintiff does not state exactly how Mr. Weinert

violated CMH's protocol for mental health emergency evaluations, other than to state that Weinert

"failed to follow up with Mr. Carl." Plaintiff's Appx. at ¶ 118. Similarly, while plaintiff contends

that he was a "person requiring treatment" as defined in CMH's written policies, he does not

explain how Mr. Weinert's failure to "follow up" violated those policies. *Id.* at ¶ 119.[13]

---

[13] The relevant CMH policies are set forth below:

Jail Mental Health Services

A.     Crisis Services

    1.     CMH emergency services are available to the jail at all times when it is believed the individual should be hospitalized in a psychiatric setting. Otherwise, there are two times set aside for the provision of crisis services. (Tuesday and Thursday afternoons 1:00 p.m. - 5:00 p.m.)

B.     Non-Crisis Services

    1.     If there are Individuals for whom there are routine mental health issues, jail medical staff can either discuss with CMH Emergency Services staff on Tuesday and Thursday, or they may call CMH ACCESS (720-3200) during business hours.

        a.     Mental health screenings may result in one of the following dispositions:

        b.     If the individual does not have an open CMH case and is not a person requiring treatment, the liaison will make recommendations regarding mental health needs and services.

        c.     CMH staff person will be notified that their consumer is in the jail so that jail medical can receive copies of current medications and any other relevant information. The individual will be kept open by CMH so that we can be of assistance and support- to jail staff and to the individual inmate.

        d.     If the individual does not have an open CMH case but is a person requiring treatment, the jail liaison will make recommendations for service. The Access Center will determine eligibility for CMH services. The individual will be referred to other agencies for appropriate services.

The failure to comply with an administrative rule or policy does not, in and of itself, rise to the level of a constitutional violation. *See Laney v. Farley*, 501 F.3d 577, 581 n. 2 (6th Cir.2007) ("[a]llegations of state law or state constitutional violations will not support a § 1983 claim"); *Smith v. Freland*, 954 F.2d 343, 347–48 (6th Cir.1992) (under § 1983, the issue was whether the defendant police officer violated the Constitution, not whether the officer should be disciplined by the police force for his actions, and observing that "[t]o hold that cities with strict policies commit more constitutional violations than those with lax policies would be an unwarranted extension of the law, as well as a violation of common sense"); *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir.1992) ("failure to comply with a state regulation is not itself a constitutional violation").

Here, plaintiff has not demonstrated that Mr. Weinert's failure to follow-up on March 10, 2008, rose to the level of a constitutional violation. In this regard, plaintiff has not shown that Mr. Weinert met the subjective prong of the deliberate indifference claim. Viewing the record in the light most favorable to the non-moving party, the Court concludes that Mr. Weinert did not "act[] with a state of mind similar to recklessness." *Jones*, 625 F.3d at 941. Mr. Weinert did not have the statutory authority to admit plaintiff to a hospital. However, he worked with two psychiatrists, Drs. Jawor and Dasai, in an attempt to have plaintiff admitted. In addition, Mr.

---

e.  If the individual is considered a candidate for jail diversion. [sic] The name will be turned over to the CMH staff person who [i]s providing that service.

f.  Recommendations for jail diversion for persons from other counties will be made to that county by the jail liaison.

CMH Policies and Procedures (docket no. 244-1 at pp. 13-14).

Weinert recognized that plaintiff had mental problems, and worked with PA McLaughlin to secure a competency hearing with Judge Nolan. Unlike Nurse Bowen - who effectively failed to provide plaintiff with any treatment after pulling his medication on March 18, 2008 – Mr. Weinert made two attempts to have plaintiff placed in a hospital for treatment. While plaintiff finds fault in Mr. Weinert's failure to follow-up with him on March 10, 2008, Mr. Weinert's visit to the Jail on that date was futile, because the Jail staff had already released plaintiff into the general population without further evaluation from CMH staff. At most, Mr. Weinert's failure to evaluate plaintiff on March 10, 2008 amounted to negligence. *See Westlake*, 537 F.2d at 860 n. 5 ("[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law"). Accordingly, Mr. Weinert's motion for summary judgment should be granted.

### IV.    Recommendation

For the reasons set forth above, I respectfully recommend that Muskegon County's motion for summary judgment (docket no. 198) be **GRANTED** as to plaintiff's claim that the County failed to train its employees and **DENIED** as to plaintiff's claim that the County adopted policies, customs or practices which were deliberately indifferent to his serious medical needs.

I further recommend that defendant Sheriff Roesler's motion for summary judgment (docket no. 186) be **GRANTED** as to plaintiff's claim that Sheriff Roesler, as an individual, was deliberately indifferent to his serious medical needs.

I further recommend that defendant Sheriff Roesler's motion for summary judgment (docket no. 186) be **GRANTED** as to plaintiff's claim that Sheriff Roesler, in his official capacity,

failed to train the Jail's employees and **DENIED** as to plaintiff's claim that Sheriff Roesler, in his official capacity, adopted policies, customs or practices which were deliberately indifferent to his serious medical needs.

I further recommend that defendant Lt. Burns' motion for summary judgment (docket no. 194) be **DENIED** as to the claim that Lt. Burns was deliberately indifferent for releasing plaintiff from the holding cell before plaintiff was evaluated and cleared by Community Mental Health and **GRANTED** as to all other claims alleged against Lt. Burns in Count I.

I further recommend that defendant Sgt. Bonstell's motion for summary judgment (docket no. 165) be **GRANTED** as to plaintiff's claim that he was deliberately indifferent to his serious medical needs.

I further recommend that defendant Sgt. Burton-Jones motion for summary judgment (docket no. 180) be **GRANTED** as to plaintiff's claim that she was deliberately indifferent to his serious medical needs.

I further recommend that defendant Sgt. Gilchrist's motion for summary judgment (docket no. 190) be **GRANTED** as to plaintiff's claim that he was deliberately indifferent to his serious medical needs.

I further recommend that defendant Nurse Bowen's motion for summary judgment (docket no. 183) be **DENIED** as to plaintiff's claim that she was deliberately indifferent to his serious medical needs.

I further recommend that defendant Mr. Weinert's motion for summary judgment (docket no. 210) be **GRANTED** as to plaintiff's claim that he was deliberately indifferent to his serious medical needs.

Dated:  December 26, 2012                          /s/ Hugh W. Brenneman, Jr.
                                                   HUGH W. BRENNEMAN, JR.
                                                   United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).